Filed 3/18/21  Walstad v. Maloney CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| DAVID WALSTAD,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>EILEEN MALONEY et al., as Trustees, etc.,<br><br>    Defendants and Respondents. | 2d. Civil No. B300586<br>(Super. Ct. No. 56-2016-00479026-PR-TR-OXN)<br>(Ventura County) |

Eileen Maloney and Patricia Farber are co-trustees of the Lambert Loucks Trust.  In May 2017, the co-trustees petitioned for approval of the Trust accounting covering the period from November 2006 to March 2017.  Trust beneficiary David Walstad objected.  The probate court overruled Walstad's objections, approved the accounting, and entered judgment.

Walstad contends:  (1) the co-trustees charged the Trust unreasonable fees, (2) the co-trustees should have rented out a residence owned by the Trust during the eight years prior to selling it, (3) we should order disgorgement of all co-trustee

fees, (4) he is entitled to double damages and attorney fees, and (5) the probate court should have admitted an appraiser's estimate into evidence.[1]  We affirm.

FACTUAL AND PROCEDURAL HISTORY

*A.  The Trust*

Loucks executed the Trust in July 1981.  He amended it several times, including to appoint Maloney (his daughter-in-law) and Carol Milligan (his longtime bookkeeper) as co-trustees. Milligan served in that role until her death in 2014, at which time Farber (Loucks's former accountant) became a co-trustee. She and Maloney continue to serve as co-trustees.

As a co-trustee, Maloney regularly met with Trust administrators, including financial advisors, attorneys, accountants, and bookkeepers.  She compiled materials for the Trust's estate tax return, provided input to those managing Trust assets, paid utilities on Trust properties, and sorted through Trust possessions.  She received monthly trustee fees for performing these duties from January 2007 (two months after Loucks's death) to April 2015.  In total, she was paid nearly $275,000 in fees (about $2,700 per month).

The Trust paid Milligan $800 in monthly bookkeeping fees, the same amount Loucks had paid her during his lifetime.  In total, the Trust paid Milligan $76,100 between December 2006 and August 2014.

Farber has never been paid for her services as a co-trustee.

---

[1] Walstad also urges us to disregard Maloney's testimony as not credible.  That argument was for the probate court, not us. (*People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410.)

2

## B. The residence

When Loucks died in 2006, Trust assets were valued at nearly $9 million. Among the Trust's properties was Loucks's Camarillo residence. The residence was built in the 1950s, and was virtually unchanged over the next six decades: The carpet was worn, the walls were "dripping with . . . nicotine" from cigarette smoke, the septic tank was unusable, and the plumbing and electrical systems needed to be replaced. There was no hot water, no heat, and no air conditioning.

The exterior of the residence was similarly dilapidated. There was fungus and dry rot around the eaves. Shrubs and trees were overgrown. Rodent holes riddled the backyard. The pool—which was just inches from the residence—had begun to sink.

### 1. Delays in selling the residence

Maloney engaged a realtor in early 2007 to evaluate the residence for sale. The realtor told Maloney that the residence would need extensive repairs before it could be sold: a new septic tank, new plumbing, a new hot water heater, a new furnace, new electrical and ducting systems, new carpet and paint, new pool equipment, and extensive landscaping. The realtor estimated that the market value would be between $630,000 and $660,000 after these repairs were completed. It would be difficult to sell the residence—even for a significantly reduced price—without completing the repairs.

Maloney asked about renting out the residence, and the realtor said that could only be done after the repairs were completed.

The following year, Maloney hired an independent appraiser to estimate the value of the Camarillo residence for the

3

Trust's tax return. The appraiser determined that the residence was worth $1,265,000 on the date of Loucks's death.

Over the next four years, the realtor regularly visited the residence and updated Maloney on developments in the housing market. In her view, the market had deteriorated so significantly that selling the residence would net the Trust hundreds of thousands of dollars less than what it was worth— even after spending $80,000 to $100,000 on repairs. Renting out the residence would require the same repairs, but even if Maloney was able to find suitable tenants the unsecured swimming pool would pose major safety and liability concerns. Even then, the most the co-trustees could expect potential tenants to pay was about $1,800 to $2,100 per month—meaning it would take years before the Trust could recoup the cost of repairs. Maloney and her co-trustee decided to wait to sell or rent out the residence.

Maloney maintained the residence until 2014. She tended to the irrigation system and avocado groves surrounding the property. She provided access to gardeners and pool maintenance workers. She secured several bids for the repair work.

Walstad occasionally asked Maloney about plans to sell the residence. Maloney told him that they had delayed doing so due to its dilapidated condition and the collapsing housing market. Walstad never asked Maloney to sell or rent the residence. He did not request an accounting or to see any Trust records prior to 2014.

2. *The residence sells in 2015*

By 2014, Maloney and the realtor had determined that the housing market had improved enough that it made sense

4

to renovate the residence and list it for sale. Maloney oversaw the repairs, which cost $82,000 and took eight months to complete. Maloney spent several hours each day on the renovation and repair project, but received no compensation for her work.

The residence sold in January 2015 for $1,050,000. Maloney received no compensation in connection with the sale. Afterward, Walstad thanked her for a "job well done" and congratulated her "on the success of [her] tireless efforts."

### C. The accounting

Walstad filed a petition for an accounting in March 2016. The probate court granted Walstad's petition in March 2017.[2] In May, the co-trustees petitioned for approval of the accounting covering the period from November 2006 to March 2017. Walstad objected to the co-trustees' petition.

The matter went to trial in February 2019. Walstad's expert witness testified that the Trust could have earned more than $330,000 from renting out the residence from 2007 through 2014. He testified that the residence would have sold for $1.2 million in "as is" condition on the date of Loucks's death. He based his estimate, in part, on that of the appraiser Maloney hired in 2008 to assist with the Trust's tax return, which Walstad moved to admit into evidence. The probate court took Walstad's motion under submission.

---

[2] Walstad requests that we take judicial notice of the order granting his petition. We grant this request insofar as Walstad asks us to notice the existence of the order (Evid. Code, § 452, subd. (d)), but deny it insofar as he requests us to notice the findings underlying it (*People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36, 69, fn. 21).

5

The court issued its tentative decision in June. The court found that the co-trustees' compensation was not excessive, and that it was reasonable to wait for the housing market to improve before renting or selling the residence. The tentative decision did not resolve Walstad's request to admit the appraiser's estimate into evidence. Walstad did not object to the tentative decision, and the court adopted it as the final decision.

DISCUSSION

*Trustee fees*

Walstad first contends the probate court erred when it determined that the fees paid to the co-trustees were reasonable. We disagree.

A trustee may be entitled to compensation for performing trust duties. (*Estate of McLaughlin* (1954) 43 Cal.2d 462, 467.) The reasonableness of that compensation depends on the circumstances of each case. (*Id.* at pp. 467-468.) Among the factors the probate court should consider include the success of the trustee's administration, whether that administration involved routine work or unusual skill and expertise, the fidelity shown by the trustee, and the time the trustee spent performing their duties. (Cal. Rules of Court, rule 7.776.) We review for substantial evidence. (*Estate of Gilliland* (1971) 5 Cal.3d 56, 59.)

Substantial evidence supports the probate court's determination that the co-trustees' fees were reasonable. The residence sold for more than $1 million—more than 60 percent higher than the realtor's estimated value in 2007. The co-trustees showed dedication to the Trust, performing significant work over the years: Maloney regularly met with Trust administrators, compiled materials and documents, and sorted through and disposed of Trust property. She spent hundreds (if

6

not thousands) of hours managing the residence and its surrounding grounds, including a nearly year-long stint overseeing a significant repair and renovation project—a project for which she received no compensation. Milligan remained similarly dedicated to the Trust and its administration, continuing to act as Trust bookkeeper after Loucks's death. These factors support the probate court's determination that the co-trustees' fees were reasonable.

*Renting the residence*

Walstad next contends the probate court erred when it concluded that the co-trustees reasonably declined to rent out the residence during the eight years prior to its sale. We again disagree.

A trustee has the duty to "invest and manage trust assets as a prudent investor would," exercising "reasonable care, skill, and caution" in doing so. (Prob. Code,[3] § 16047, subd. (a).) This includes the duty to "make the trust property productive under the circumstances and in furtherance of the purposes of the trust." (§ 16007.) But even if a trustee fails to perform these duties, a probate court may excuse that failure if it determines that they "acted reasonably and in good faith under the circumstances." (§ 16440, subd. (b).) We review for substantial evidence. (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292 (*Orange Catholic*).)

Substantial evidence supports the probate court's determination that the co-trustees acted reasonably and in good faith when they declined to rent out the residence between 2007 and 2014. The evidence admitted at trial showed that the residence was uninhabitable and in need of more than $80,000 in

_____

[3] Unlabeled statutory references are to the Probate Code.

repairs. Those repairs would have had to be completed before the residence could be rented. And once completed, there remained safety and liability concerns due to the unsecured pool at the residence. Walstad's conclusory assertions to the contrary notwithstanding, these circumstances support the determination that the co-trustees acted properly when they decided to wait for the housing market to recover before undertaking the necessary repairs. (*Orange Catholic, supra*, 28 Cal.App.5th at pp. 294-295.)

*Disgorgement*

Next, Walstad claims we should order the co-trustees to disgorge and repay all the fees they earned from the Trust because they "stipulated" that his 2016 petition for accounting was granted in "all respects." But he cites nothing in the record to support this claim. (Cf. *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8 [declining to consider assertion unsupported by citation to record]; Cal. Rules of Court, rule 8.204(a)(1)(C) [briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].) Nothing in the probate court's ruling on his petition suggests that it was granted in "all respects." Walstad moved the court to consolidate his petition for an accounting and the co-trustees' petition for approval of the accounting for trial. Consolidation would have been unnecessary had the probate court granted his petition in "all respects."

*Double damages and attorney fees*

Walstad next invites us to order the co-trustees to pay double damages to the Trust, plus his attorney fees. We decline this invitation.

8

A person who files a petition pursuant to section 850 may recover double damages from "a person [who] has in bad faith wrongfully taken, concealed, or disposed of property belonging to . . . a trust" plus their attorney fees and costs. (§ 859.) But Walstad points to nothing in the record showing that he filed a section 850 petition. And even if he did, he points to nothing in the record showing that he provided the co-trustees with 30 days' notice of his request (§ 851, subd. (a)) or a description of the relief he sought (*id.*, subd. (c)(2)). The probate court thus did not abuse its discretion when it denied Walstad's request for section 859 relief.[4] (*Estate of Roberts* (1990) 225 Cal.App.3d 1017, 1020-1022 [abuse of discretion to grant motion that does not comply with statutory requirements].)

*The appraiser's estimate*

Finally, Walstad contends the probate court erred when it did not rule on his request to admit into evidence the appraiser's estimate of the residence's value. But Walstad did not object to the court's tentative decision or otherwise point out the court's omission of his request. His contention is forfeited. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.)

It also lacks merit. The appraiser's estimate was hearsay (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 752-753), and Walstad cites no authority for his claim that it was admissible pursuant to Evidence Code section 1222 as the statement of a party-opponent. And even if it were, exclusion of

---

[4] We also reject Walstad's argument, made for the first time on appeal, that we should direct the probate court to exercise its equitable powers and order the co-trustees to pay his attorney fees. (*Willden v. Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 636, fn. 5.)

the appraisal was clearly harmless:  The probate court knew that Maloney had obtained the appraisal, and Walstad's own expert discussed it as the basis for his valuation of the residence. Moreover, information "identical" to that in the appraisal was admitted into evidence as part of the Trust's estate tax return.  It is thus not reasonably probable that admission of the original appraisal would have affected the probate court's decision.  (*In re Marriage of Smith*, at p. 751.)

DISPOSITION

The judgment is affirmed.  Maloney and Farber shall recover their costs on appeal.

NOT TO BE PUBLISHED.

TANGEMAN, J.

We concur:

YEGAN, Acting P. J.

PERREN, J.

10

Kevin G. DeNoce, Judge

Superior Court County of Ventura

_____

Catanese & Wells, T. Randolph Catanese and Douglas R. Hume for Plaintiff and Appellant.

Ferguson Case Orr Paterson, David B. Shea and Joshua S. Hopstone for Defendants and Respondents.