Filed 7/27/21  Washington v. IMT Associates CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| WINSTON WASHINGTON,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>IMT ASSOCIATES, as Trustee, etc.,<br><br>　　　　Defendant;<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br><br>　　　　Respondent. | A158448<br><br>(Alameda County<br>Super. Ct. No. RP09451070) |

　　　　This appeal arises out of a dispute between Winston Washington and Robin Simpkins regarding administration of a trust established on behalf of their mother, Estelle Washington.[1]  After Robin resigned as trustee in 2017, Winston filed a petition to surcharge Robin for breach of trust and also objected to her accounting.  The trial court rejected most of Winston's claims, but held Robin liable for failing to file tax returns for the trust.  Winston filed the instant appeal, arguing that the trial court erred by accepting Robin's incomplete accounting and excusing her from further liability to the trust.

---

　　　　[1]  For clarity, we use first names to distinguish between members of Estelle's family.

Robin's surety, Liberty Mutual Insurance Company, has filed a respondent's brief opposing Winston's claims. We affirm the trial court's order.

BACKGROUND

## I. Estelle's Conservatorship and Trust Estate

Estelle suffers from Alzheimer's disease, which was diagnosed sometime after her husband died in 2006. Herb Thomas was appointed conservator of Estelle's person and estate, but by 2008 several of Estelle's children were dissatisfied with Thomas. Around that time, Robin moved into Estelle's home in Oakland so that she could assist with her mother's care. Robin had been living in Southern California, but she relocated at the request of her siblings.

In October 2008, Robin replaced Thomas as conservator of the person for Estelle. Throughout the proceedings at issue in this appeal, Robin has provided "hands-on" caregiving virtually every day and night to Estelle, who can be " 'aggressive' " due to her illness. Robin also performs household chores, manages paid caregivers, and makes sure that Estelle receives proper medical care.

In 2009, Thomas obtained court authorization to create the Estelle Washington Revocable Trust. Estelle is the life beneficiary of the trust, which provides that when she dies her estate shall be distributed in equal shares to her five children: Terry, Jacalyn, Stewart, Winston and Robin. In June 2009, Robin was appointed trustee of Estelle's trust and posted a bond of $370,000, which was issued by Liberty Mutual.

In January 2010, Thomas was discharged as conservator of Estelle's estate. At that time, the trust held $165,049.88 in cash and five real properties. Three properties are located in Berkeley: a four-unit apartment building on Adeline Street (Adeline); a home on Alcatraz Avenue (Alcatraz);

and a three-unit building on Shattuck (Shattuck). The other two properties are located in Oakland: a two-unit building on Chabot Road (Chabot); and a home on Ocean View Avenue (Ocean View). At all relevant times, Estelle and Robin have lived in Chabot's upper unit.

When Robin became trustee in June 2009, all of the trust properties were tenant-occupied, except for Ocean View and the upper-unit of Chabot. Robin retained a professional company to manage the Berkeley properties. There were mortgages on Ocean View and Chabot and Robin did not take out any additional mortgages or loans during her tenure.

## II. The Present Action

On November 14, 2016, Robin executed a document pursuant to which she resigned as trustee of Estelle's trust, effective immediately or upon court approval if required. She also consented to appointing a guardian ad litem for Estelle and an investigation to determine whether Robin should remain as conservator of the person of Estelle.

On April 3, 2017, the court granted a petition filed by Robin's sisters to accept Robin's resignation and appoint IMT Associates as successor trustee of Estelle's trust. The court also ordered Robin to prepare and file an accounting covering the entire period she served as trustee.

On September 8, 2017, Winston filed a petition to surcharge Robin for breach of trust. Winston alleged that Robin breached her duties to manage trust assets, provide accountings, file income taxes on behalf of the trust, and make mortgage payments on trust properties. In his petition, Winston made specific objections to three actions by Robin. First, she filed a Chapter 13 bankruptcy petition on behalf of the trust to forestall a foreclosure initiated against Chabot. Second, she failed to make necessary repairs at trust properties, which led to them being either unoccupied or rented for less than

fair market value.  Third, she hired caregivers for Estelle who were not covered under Estelle's long-term care insurance plan, using trust funds that would otherwise have been available to pay mortgages.  As damages for these alleged breaches, Winston requested that the court surcharge Robin in an amount "not less than" $1,500,000 and order Liberty Mutual to satisfy the judgment up to the full amount of its bond.

On November 6, 2017, Robin filed a report and petition to settle her first and final account.  An accounting for the period from June 17, 2009 to April 3, 2017 was incorporated as an exhibit.  In her petition, Robin conceded there were "several unexplained transactions" and "a gap in the accounting from November 2011 through April 2012," but she stated that statements had been "requested."  Robin also reported that the property management company maintained a bank account for its work on behalf of the trust.  Robin stated that she had not received bank statements for 2017, which resulted in a "significant gap regarding the income and expenses from management" for the final four months of her tenure.  Robin acknowledged her accounting was "late," but alleged that she worked diligently and acted in the best interest of the trust.  She did not request fees for herself but requested $33,435 as a reasonable fee for her counsel.  She also asked the court to exonerate the Liberty Mutual bond.

Robin's 69-page accounting includes summaries and itemized lists of receipts and disbursements.  Robin reported that assets on hand at the beginning of the accounting period totaled $5,757,076.90 and at the end of the period she claimed total credits of $5,717,329.30.  When Robin became trustee, the total value of trust assets was $4,100,049.88, and at the end of her tenure, the assets had a total value of $3,974,900.31.  Robin's accounting assumes that real property assets had the same value at the beginning and

end of this reporting period, $3,935,000. At the beginning of the period, the trust held $165,049.88 in cash and at the end, there were total cash assets of $39,900.31.

The court set a hearing for February 7, 2018 to address Robin's petition for approval of her accounting and Winston's petition to surcharge Robin. On February 6, Winston filed objections to Robin's accounting on the following grounds: (1) multiple transactions were unexplained and there were gaps for which no information was provided; (2) there was information about "the amount of rental income that was received and the date it was received" but "no separate indication" as to which trust property the income entry pertained to; and (3) the accounting did not balance because Robin reported total charges of $5,757,076.90 and total credits of $5,717,329.30, a discrepancy of $39,747.60.

On February 7, 2018, the court was advised that Winston failed to give Liberty Mutual notice of his surcharge petition and the proceedings were continued. In May 2018, Liberty Mutual filed objections to the petition, arguing that Winston's claim against Liberty Mutual was procedurally improper and premature. As to Robin, it argued that Winston's claims were not timely and not supported by evidence, Robin's discretionary decisions did not constitute a breach of trust, and any liability was offset by fees and costs the trust owed to Robin.

On September 17, 2018, Meredith Taylor from IMT Associates filed a petition requesting that the court settle her first account, authorize her to resign as successor trustee of Estelle's trust, authorize payment for trustee and attorney services, and appoint a public guardian as successor trustee.

Taylor's petition summarized material developments during her year as trustee, beginning with the eviction of Estelle's son Stewart from Ocean

View, which he had occupied since approximately 2006. This property was in major disrepair, would require over $300,000 to become habitable, and Taylor was "not willing" to take on the liability of coordinating the major renovation. Taylor arranged for Stewart to be evicted in anticipation of a sale and to reduce the liability to the trust caused by having the property occupied by a family member who was not paying rent. But Stewart refused to vacate the property, repeatedly breaking down boards erected to keep him out. Taylor believed that Winston was assisting Stewart in "continuing to gain entry to the home." Winston and Stewart had also objected to Taylor's petition to sell the property, which she dismissed after realizing it would mire her in "protracted litigation which would be a drain on the trust." Taylor believed that selling Ocean View was "required for proper administration," but she reported that the matter was beyond her control.

Taylor reported that Chabot was the only trust property aside from Ocean View that was not renter-occupied. Estelle lived in the upper Chabot unit and the lower unit was not habitable due to damage caused by two sewage leaks. When Robin was trustee, she used insurance proceeds from a 2009 incident to make repairs, but only "half of the sewer lateral was repaired" and when another leak occurred in 2012 the insurance company refused to pay, attributing the damage to the first incident. Neither Robin nor Taylor had repaired the unit because the trust did not have adequate funds. The trust was operating at a shortfall of approximately $12,000 a month, without considering attorney fee obligations. Due to the trust's liquidity problem, Taylor obtained loans against two of the Berkeley properties: a small encumbrance against Shattuck, which was spent within a year; and a $215,000 loan against Adeline.

Taylor reported that Estelle's personal taxes had not been filed since 2008 and trust tax returns had never been filed. Taylor was initially unable to file these returns because there was a gap in Robin's accounting for the period from November 2011 through April 2012. Taylor reported that penalties would continue to accrue until the returns were filed but she did not anticipate a significant liability because there were no penalties for years that the trust operated at a loss.

Taylor requested leave to resign as successor trustee due to ongoing conflict with Estelle's children, which made it "impossible" for her to continue as trustee. Taylor's primary conflict was with Winston and Stewart who objected to selling any trust property and insisted that Ocean View be renovated despite Taylor's view that it needed to be sold because the trust would never recoup the cost of such a major renovation and the trustee was in no position to supervise such a project. Taylor requested that the court appoint the public guardian as successor trustee because she was not aware of a professional fiduciary willing to serve as trustee of this trust.

## III.  The Evidentiary Hearing and Special Master's Report

On September 24, 2018, the trial court appointed Paul Epstein as "Special Master to deal with the issues regarding the approval of account and surcharge and to file recommendations with the Court."

In February 2019, the parties participated in a two-day evidentiary hearing before the special master. Robin appeared in pro per and Winston appeared with counsel. Estelle was represented by a guardian ad litem (GAL), and by Taylor who appeared as the current trustee. Liberty Mutual appeared as surety for Robin.

At the hearing, Winston argued that Robin was liable to the trust for $1,500,000 in damages because she violated her duties as trustee by (1)

mismanaging rental properties; (2) paying private caregivers; (3) filing a bankruptcy petition; (4) taking out loans; (5) filing a defective accounting; and (6) failing to file tax returns. Liberty Mutual and the GAL opposed Winston's claims, and argued that Robin should be excused from liability for any breach of trust she may have committed because she acted reasonably and in good faith. (Prob. Code, § 16440, subd. (b); statutory references are to this code unless otherwise indicated.) Liberty Mutual and the GAL also asserted the equitable defenses of laches and unclean hands against Winston.

Four witnesses testified before the special master: Robin, Winston, Taylor, and Mary Orem who was employed by the trust's property management company. The hearing was not transcribed because the parties did not arrange for a court reporter. The special master summarized relevant evidence in a May 2019 report, which contains findings and recommendations addressing Winston's six claims.

## A. Lost Rental Income

Winston claimed that Robin caused the trust $1,100,000 in damages by failing to cure vacancies at three trust properties: Unit C in Adeline; the lower unit at Chabot; and the Ocean View house. The special master found the following facts regarding these properties:

**Adeline**: When Unit C became vacant, Robin "undertook a minor remodel project," which included installing an electric wall heater to replace a space heater that Thomas had installed when he was trustee. The property manager was unable to rent the unit with the electric wall heater. Orem testified that trying to figure out what type of heater would satisfy the City of Berkeley was a " 'conundrum' " and a " 'major problem' " for the property management company until January 2017, when there were sufficient funds

to install a gas heater and complete other repairs.  The unit was rented in April 2017.

**Chabot**:  A toilet back-up in 2009 damaged the lower unit, including new carpet Robin had installed.  Roto Rooter was called but the trust did not have funds to repair the sewer lateral and make the unit habitable.  A second incident in 2012 caused additional significant damage.  The lower unit could not be rented due to water intrusion damage.  The trust did not have sufficient cash to make necessary repairs and there was no viable insurance claim.

**Ocean View**:  This house was "uninhabitable" when Robin became trustee and continued to be uninhabitable while Taylor served as trustee.  For many years, Stewart has been living in Ocean View as a "squatter" without paying rent.  Both Robin and Taylor attempted to remove Stewart, boarding up windows, calling the police, and through eviction.  Stewart, who probably suffers from mental illness, refused to leave.

After considering the parties' evidence, the special master found that Winston did not carry his burden of proving that Robin's failure to "cure" vacancies in these properties constitutes a breach of trust.  (See *Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 853 (*Van de Kamp*) [beneficiary has "initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it"].)  First, administering the trust with vacancies was not a breach because the trust instrument gives the trustee express power to retain underproductive property.  Second, even if Robin had a duty to make all properties productive, she was not a professional property manager or trustee as her siblings knew when they asked her to serve.  The heater issue at Adeline was a major problem and obstacle even for the professional property manager.  And the trust did not have funds to make the

other two properties habitable. Finally, the special master found, even if Robin committed a breach of trust, she acted reasonably and in good faith, and she should be excused from liability under section 16440. (Citing *Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 294 (*Arvizu*).)

## B. Private Caregivers

Winston claimed that Robin caused $420,000 in damages by using trust funds to pay private caregivers rather than taking advantage of "long-term care benefits available through CalPERS." Winston did not produce any evidence regarding the nature of Estelle's CalPERS benefits. Robin testified that she regularly applied for and received CalPERS benefits, but they were not sufficient to pay for all of the caregiver time that her mother required. The special master found that Winston failed to carry his burden of proof as to this claim.

## C. Bankruptcy Expenses

Winston claimed Robin was liable for all expenses relating to Estelle's bankruptcy because bankruptcy could have been avoided if Robin had properly managed the trust. The special master recommended denying this claim in light of his finding that "Robin did not commit a breach of trust relative to the vacancies, as well as the uncontroverted and credible testimony that Robin relied on the advice of counsel prior to filing for bankruptcy protection."

## D. Loans

Winston claimed Robin was liable for "loan fees" because her accounting did not contain sufficient information about " 'the loan details or the purpose of the loans.' " The special master found Winston did not carry his burden of proving a breach of trust relating to loans because the undisputed evidence showed that all loans were in place when Robin became

trustee, Winston failed to explain what he meant by a "loan fee," and Winston failed to establish a "legal basis" for charging Robin such a fee.

### E. Robin's Accounting

Winston claimed that Robin breached her duty to account because, as outlined in his objections to the accounting, several receipt and disbursement items were inaptly described as " 'unclear,' " the accounting did not balance, and there were reporting gaps.

The special master found that Winston's objections were valid. Disbursements that were described as " 'unclear' " were not justified and the special master accepted Winston's determination that the unclear disbursements totaled $227,857.82. The accounting did not balance because there was a discrepancy of $39,747.60 between the total reported charges and the total reported credits. And there were reporting gaps for the period between November 8, 2011 and April 15, 2012. In addition, the special master observed that the accounting purported to have a start date of June 17, 2009 but the first reported disbursement occurred on October 19, which suggests a gap during the early months of Robin's tenure.

The special master concluded these accounting deficiencies support a finding that Robin committed a breach of trust. He also concluded that Robin should not be excused from liability under section 16440, subdivision (b) because Robin's failure to "keep and maintain trust records or provide accountings during her tenure" was not reasonable. Moreover, the special master found section 16440, subdivision (b) does not apply in this context because this provision relieves a trustee of liability that would otherwise be imposed under subdivision (a) of the statute for causing financial damage to trust assets, such as depreciation in value or lost profits. Here, the special master did not find that Robin's breach of trust caused financial damage, but

rather that she breached her duty to maintain records and provide accountings.

Under governing law, the special master found, the trustee's duty to account applies to every item in the accounting, the burden of proof is on her, and any doubt is resolved against her. (*Estate of McCabe* (1950) 98 Cal.App.2d 503, 505 (*McCabe*).) Applying these principles, the special master concluded that it would be appropriate to impose liability on Robin for breaching her duty to account, and proposed a total penalty of $267,605.42. This figure represented the sum of unexplained disbursements ($227,857.82) and the discrepancy between reported charges and reported credits ($39,747.60), without an additional penalty for " 'gap' " periods.

Because a beneficiary's remedies against a trustee are "exclusively in equity" (§ 16421), the special master recommended that any liability the court decided to impose for the defective accounting be offset by compensation Robin could claim for acting as trustee and conservator of Estelle's person. (Citing *Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 108 (*Plut*); Civ. Proc. Code, § 431.70.)

The special master recommended a reasonable annual trustee fee for Robin would be 0.5 percent of the value of the trust assets at the beginning of her tenure. He found that the generally accepted fee is 1 percent of the trust assets (Evid. Code, § 452, subd. (g)), but recommended half that amount because Robin did not "fulfill certain fundamental trustee duties." Under the special master's formula, Robin would be entitled to a total fee of $154,120.83 for the eight-year period she served as trustee.

The special master found that Robin also had a viable claim for compensation as a caregiver and conservator, as there were no allegations that she breached any duty in performing these roles. Based on experience

from other cases, the special master recommended $30 per hour as a reasonable fee for a nonprofessional conservator. If Robin were paid for two hours of work a day for the eight years that she had served as trustee, she would be entitled to a total fee of $186,150. The special master recommended this amount, with the caveat that "2 hours per day [wa]s substantially lower than the actual time that Robin spent as caregiver and Conservator, particularly in light of the services [Robin] likely performed overnight."

Thus, the special master recommended that Robin was entitled to total minimum compensation of $340,270.83. Because this amount exceeds any liability that could be imposed for defects in the accounting, the special master recommended that the court not require Robin to pay any damages for the breach of her duty to account.

### F. Tax Penalties

Winston claimed that Robin was liable to the trust for failing to file tax returns. The special master agreed that Robin breached her duty as trustee to file tax returns and found that this inaction was "inexcusable." At the evidentiary hearing, Taylor testified that she was in the process of completing and filing back income tax returns for the trust. Costs associated with that exercise were not a basis for surcharge as they were a regular cost of administration. However, the special master recommended that the court order Taylor to file a declaration setting forth the total interest and penalties incurred due to the late filing of the returns, and that Robin be surcharged for that amount.

### G. Attorney Fees

Finally, Robin and Winston each sought payment from the trust to cover their respective attorney fees. The special master recommended denying Robin's request because she did not retain counsel until after she

was asked to resign as trustee, and her counsel's work was limited to preparing the accounting, which was "substantially defective" and did not "benefit" the trust. The special master also recommended denying Winston's request based on the general rule that beneficiaries are required to pay their own attorney fees. (*Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1595.) This recommendation was supported by findings that Robin did not put forth a bad faith defense to Winston's petition and there was no other legal basis for paying Winston's attorney fees from the trust.

## IV. The Trial Court's Order

On June 28, 2019, Winston's surcharge petition was granted in part in a written order that was issued by the court after the matter was argued and submitted at a June 14 hearing. The order reflects that the court considered the special master's report, objections and responses to the report by interested parties, recommendations of the GAL, and a declaration from trustee Taylor, who reported that the trust had incurred $8,896 in penalties because of late-filed tax returns.

In its June 2019 order, the court held "that the special master did not abuse his discretion in making his findings filed on May 20, 2019," and adopted the special master's "findings in full." The court expressly confirmed several key findings by the special master including that the trust instrument empowered Robin to retain unproductive property, Robin acted reasonably and in good faith with respect to her management of trust properties, and Robin acted in good faith in arranging caregivers, incurring bankruptcy costs, paying loans and providing an accounting. The court ordered there would be no surcharge for these actions or recovery of attorney fees for Winston. The court also accepted Robin's accounting.

In its order, the court also found that "the doctrine of laches bars recovery" by Winston as to "the myriad of allegations made by [him] concerning the . . . unproductive nature of the rental properties," finding no evidence to explain why Winston, "a licensed plumber and property owner, waited until 2017 to intervene."

Finally, in accordance with the special master's recommendations, the court found that Robin is liable for penalties and interests for failing to comply with her duty as trustee to file tax returns and ordered that Robin be surcharged $8,896 in favor of the trust. In all other respects, Winston's surcharge petition was denied.

On July 23, 2019, Winston filed a motion to vacate the June 2019 order and enter a different order. Winston argued that the ruling barring his claims under the doctrine of laches was not supported by the special master's findings and was inconsistent with granting the surcharge petition in part. Winston also requested a new trial on multiple grounds including that the burden of proof should not have been placed on him. This motion was heard and denied by the court on September 11, 2019. In its minute order, the court explained that laches "is intended to be an additional finding made by the Court in addition to the adoption in full of the Special Master's Report." Finding Winston's other arguments unpersuasive, the court declined to vacate its June 2019 order.

## DISCUSSION

Winston contends the trial court made multiple prejudicial errors by settling Robin's account. In presenting his arguments, Winston suggests two alternate grounds for reversing the June 2019 order: (1) the court erred as a matter of law by accepting an incomplete accounting; and (2) the court made contradictory findings. We will separately address these two flawed theories.

## I. The Court Had Discretion to Accept the Accounting

Winston contends the trial court committed an error of law by accepting an accounting that was admittedly incomplete rather than requiring Robin to file a supplemental accounting. Trial courts have broad discretion to determine whether an adequate accounting has been made. (*Christie v. Kimball* (2012) 202 Cal.App.4th 1407, 1413 ["Determining the need for an accounting is a matter within the trial court's sound discretion"]; *Estate of Hershel* (1959) 168 Cal.App.2d 658, 660 ["question of when a trustee's account is sufficiently detailed . . . must necessarily be committed to the sound discretion of the court"].) We find no abuse of discretion under the circumstances presented here.

When an accounting is contested, the burden of proof is on the trustee to show its sufficiency; all doubts attributable to the failure to keep records or proffer evidentiary support are resolved against the trustee. (*McCabe*, *supra*, 98 Cal.App.2d at p. 505.) This settled principle compels the conclusion that Robin breached her duty to account, as the special master found. Adopting that finding, the trial court acted within its discretion by accepting Robin's accounting subject to a surcharge due to its deficiencies. (§§ 17200 & 17206.) This decision was reasonable, considering that Robin's liability stems from the fact that she failed to keep the records necessary to provide an appropriate accounting. (See *Arvizu*, *supra*, 28 Cal.App.5th at p. 293 [trial courts have "wide latitude in deciding whether and what types of damages to impose on a trustee who commits a breach of trust"].)

As Winston contends, the surcharge calculated by the special master does not include an additional penalty for " 'gap' periods," but he does not articulate how or why the decision not to impose an additional penalty constituted an abuse of discretion. Robin was charged with receiving assets

totaling $5,757,076.90 and was able to report total credits of $5,717,329.30. By imposing a surcharge for the $39,747.60 discrepancy, the special master's formula penalized Robin for gaps in her accounting. Winston does not contend that any specific event occurred during a gap period that adversely affected the trust or articulate any other reason for imposing an additional penalty on Robin. Under these circumstances, we find no abuse of discretion in the trial court's adoption of the special master's formula for calculating Robin's liability for defects in her accounting records.

Winston argues that the trial court abused its discretion because Robin's accounting does not contain the minimum information required for accountings that must be filed with the court. (Citing §§ 1060 & 16063.) In making this argument, Winston complains about aspects of the accounting that were not mentioned in his objections or the special master's report. For example, he contends the accounting fails to provide adequate descriptions for " 'over $515,000 in receipts.' " As support for this assertion, Winston quotes an allegation that was made by his sister Terry, who filed preliminary objections to Robin's accounting but subsequently withdrew them. This allegation is not evidence. Furthermore, Winston cannot establish trial court error by objecting to the accounting on a ground that was not presented below.

In any event, there can be no dispute on appeal that the accounting contains substantial deficiencies, as the special master and trial court found. This does not mean that the trial court was required to reject Robin's accounting, as Winston appears to contend. Winston relies on two cases that required supplemental accountings, neither of which supports his claim that the trial court erred by accepting Robin's accounting. (*Purdy v. Johnson*

(1917) 174 Cal. 521 (*Purdy*); *Estate of Howard* (1976) 58 Cal.App.3d 250 (*Howard*).)

Purdy was an action by the beneficiary of a testamentary trust to compel the trustees to distribute her share of the estate and provide a proper accounting. (*Purdy, supra*, 174 Cal. at pp. 524–525.) Plaintiff, who became an adult during the 19 years of trust administration, alleged that the trustees had committed mismanagement, negligence and fraud. (*Id.* at pp. 523–524.) Defendants claimed the right to retain plaintiff's share of the estate because she refused to reimburse them for funds advanced to her from the trust. (*Id.* at p. 525.) During a protracted and unwieldy trial, the defendants obtained a continuance to employ an "expert" who prepared a restatement of all their prior accountings. (*Id.* at p. 526–527.) Ultimately, the trial court found the defendants submitted a "correct accounting of the trust estate," which showed the plaintiff owed the trust almost nine thousand dollars and, until that amount was paid, the defendants were not required to convey plaintiff's interest. (*Id.* at p. 526.) On appeal, the judgment was reversed, and a new trial ordered.

The *Purdy* court held that the trial court committed reversible error because the "entire trial was conducted upon the erroneous theory that the burden of proof was upon the beneficiary to point out the particulars in which the account was erroneous, and that she was bound to go forward and establish affirmatively the impropriety of the charges and credits which she assailed." (*Purdy, supra*, 174 Cal. at p. 528.) Consequently the "trustees failed to prove an account that would justify the judgment under review." (*Ibid.*) For example, the court found, interest charges, "aggregating thousands of dollars," were incurred because the estate's bank account was perpetually overdrawn, even as a trustee held trust money outside the

account, and it was not possible to determine from the accounting whether the charges were justified.  (*Id*. at p. 530.)  Promissory notes were left outstanding, with no "showing that the notes could not, with due diligence, have been collected," and there were shortfalls in lease payments with no satisfactory explanation.  (*Id*. at p. 528.)  Upon retrial, the trustees would have the burden "to support every item of their account," and where they could not do so, "the computation" had to be "made upon the basis most unfavorable to them."  (*Id*. at pp. 529–530.)

Winston contends the trial court violated *Purdy* because it is not possible to determine from Robin's accounting "what the surcharge should be."  We disagree.  Whereas the *Purdy* trial court misapplied the burden of proof, this record shows that the special master understood and correctly applied the burden of proof with regard to Winston's claim that Robin breached her duty to account.  And, in contrast to *Purdy*, all of the unexplained charges were resolved against Robin, and an additional surcharge was imposed due to the discrepancy between reported charges and reported credits.

*Estate of Howard*, *supra*, 58 Cal.App.3d 250 was an appeal in a probate proceeding regarding administration of nine testamentary trusts pursuant to which the testator conveyed interests in his ranch to multiple beneficiaries.  (*Id*. at p. 253.)  When trustees of five of the trusts filed a petition to settle their accounts, several current and former beneficiaries objected and requested that the trustees be surcharged for negligence, mismanagement, and concealment of their misconduct.  (*Id*. at pp. 253–254.)  At a hearing on the matter, the court accepted the objectors' offer of proof but refused to take testimony.  Thereafter, the court found that disputes about the propriety of the trustees' actions might give rise to other types of actions, but their

accounts were " 'in order.' " In decrees settling the accounts, the court stated that the trustees had " 'faithfully managed' " each trust, and acted in accordance with its terms. (*Id.* at p. 254.) Reversing the judgment on appeal, the *Howard* court found the trial court erred by failing to consider the beneficiaries' claims of misconduct and denying them a full evidentiary hearing. (*Id.* at pp. 256–259.) Nothing comparable happened here, where Winston had ample opportunity to present his claims at the evidentiary hearing conducted by the special master.

Winston also relies on *McCabe, supra,* 98 Cal.App.2d 503, which involved a testamentary trust established on behalf of the testator's 14-year-old daughter. The trust was administered by the child's mother, who kept no records and comingled $50,000 in trust funds that were entrusted to her with money from her own trust. The daughter's trust terminated when she turned 21 and five years later the trustee filed a first and final accounting in which she claimed credits of $54,065 for expenditures during her administration of the trust. An order settling the account was reversed on appeal as to a specific charge of $22,500, ostensibly representing the " 'reasonable average cost" of the beneficiary's board, clothes, laundry service, etc. (*Id.* at p. 504.) Following a remand, the trustee filed a supplemental accounting listing monthly charges totaling $23,739 for food, board, clothes, and the like, which the trial court approved. (*Ibid.*)

On appeal, the *McCabe* court refused to place a "stamp of approval" on the manner in which the trust was conducted or upon the trustee's accounting. (*McCabe, supra,* 98 Cal.App.2d at p. 509.) Reviewing the trial record, the court found that the accounting contained faulty data and was not supported by the evidence, the trustee's testimony was contradictory, disclosed that she did not remember the expenditures she claimed, and

established that she treated the trust as if it was her own. (*Id.* at pp. 506–507.) Applying well-established rules holding the trustee to highest good faith and strict accountability, requiring that doubts be resolved against her, and precluding her from profiting from her own negligence or fault, the court refused to discharge the trustee "from all liability on such unsatisfactory evidence." (*Id.* at p. 509.)

Citing *McCabe*, Winston contends that well-established rules preclude this court from affirming the order accepting Robin's accounting. We disagree. The special master followed *McCabe* by placing the burden on Robin to defend her accounting. And, in contrast to the order under review in *McCabe*, Robin was not relieved of *all* liability; whereas the *McCabe* trial court ignored evidence that the trustee had violated multiple duties, the special master made findings with respect to each breach of fiduciary duty claim asserted by Winston and concluded that Robin breached her duties to maintain adequate account records and to file tax returns. We do not place a stamp of approval on Robin's accounting but simply affirm the trial court's discretionary determination to accept it, despite its shortcomings, because Robin does not have any supplemental information to provide.

Taking a different tack, Winston argues that the special master violated *Purdy*, *Howard* and *McCabe* by placing the burden on Winston to prove that Robin violated her duty to account for lost rental income and "missing" CalPERS monies, and to justify the bankruptcy charges, and loan modifications. Winston did not object to Robin's accounting on these grounds. Instead, he filed a petition to surcharge Robin based on claims that she breached her fiduciary duties and damaged the trust by failing to generate rental income, hiring private caregivers for Estelle, filing for bankruptcy and incurring loan "fees."

The trustee has the "burden to establish the correctness of [her] accounts," but "[t]his rule goes merely to items in the account. It does not require the trustee to anticipate and defend against charges of dereliction of duty and malfeasance which do not arise from anything on the face of [her] accounts but are grounded on other matters. It does not remove from a plaintiff who sues a trustee on charges of fraud and malfeasance the burden, which the law would cast on him in case of another defendant, of proving his charges. The trustee is entitled to the benefit of the presumptions of regularity and good faith." (*Neel v. Barnard* (1944) 24 Cal.2d 406, 420–421.) Thus, as the special master explained, Winston had the burden of proof with respect to his breach of fiduciary duty claims for damages. (*Van de Kamp*, *supra*, 204 Cal.App.3d at p. 853.) Having failed to carry that burden, Winston may not recast his claims as accounting matters.

In a related argument, Winston contends that Robin must be held to account for CalPERS benefits that were paid to the trust. In the trial court, Winston made the opposite claim, arguing that Robin is liable for failing to utilize Estelle's CalPERS long-term care policy. According to this pleaded claim, Robin breached her duty as trustee because she did not apply for CalPERS benefits until after the trust went into bankruptcy in 2016. Winston alleged that Robin's inaction caused the estate $420,000 in damages. The special master recommended denying this claim because Winston failed to produce any evidence regarding the alleged CalPERS benefit and relied solely on his unproven allegations.

On appeal, it is not clear whether Winston disputes the special master's findings with respect to the CalPERS benefit. Absent a transcript of the evidentiary hearing, we presume the special master's findings are supported by sufficient evidence. (*Moriarty v. Carson* (1960) 184 Cal.App.2d 51, 54.)

Winston cannot overcome the presumption here, where substantial evidence supporting the special master's finding is summarized in his report. Winston produced no CalPERS policy, statement or other evidence, and Robin credibly testified that she used CalPERS benefits to pay caregivers, but it "was not enough to pay for all of the caregivers' time." In addition, we note that Winston's claim rests on an assumption that Robin was prohibited from using trust funds to pay private caregivers if funds for Estelle's care were available from another source. Estelle's trust instrument states that all net income from this revocable trust shall be distributed to Estelle and gives the trustee unqualified discretion to distribute as much principle as she "deems proper for the settlor's comfort, welfare, and happiness." Winston failed to establish that Robin exceeded her authority under these provisions by using trust money to pay Estelle's private caregivers.

Having failed to prove his pleaded claim, Winston now seeks reversal of the judgment to pursue a new theory: that the trust actually received $420,000 in CalPERS benefits, which should be charged to Robin because she did not account for them. Winston intimates that he may raise this issue on appeal because evidence produced by Robin at the evidentiary hearing proves her liability. According to this theory, Robin admitted under oath that she received CalPERS benefits totaling $420,000, and yet her accounting contains only a few receipts for $5,015 for CalPERS benefits received in 2017. Therefore, Winston contends, Robin must be held to account for the missing money.

We find no evidence that Robin admitted receiving monthly payments from CalPERS for the entire period she was trustee or that any such money is "missing" from the trust estate. The record does not reflect when Estelle became eligible for long-term care benefit, what benefits were available, or

how they were paid.  According to the surcharge petition, Robin began utilizing the CalPERS policy after 2016, and the record shows that Robin did account for the CalPERS payments she received in 2017.  The accounting contains four entries for "CalPERS, Long term care" receipts in 2017, and two additional entries during that period for $5,015, which could potentially be CalPERS disbursements but are described as "counter credit" receipts.  Winston never alleged that CalPERS benefits were received by the trust prior to 2017, thus forfeiting the right to make this claim now.

## II.  The Court Did Not Make or Adopt Inconsistent Findings

Winston contends that the trial court's decision to accept Robin's accounting is inconsistent with the special master's findings, which were adopted in full by the court.  Characterizing the special master's findings as a special verdict, Winston contends he is entitled to de novo review of the question whether inconsistent findings require reversal of the order settling Robin's accounting.  (Citing *David v. Hernandez* (2014) 226 Cal.App.4th 578, 585 [a jury's special verdict is reviewed de novo " 'to determine whether its findings are inconsistent' "].)

A decision by a referee or commissioner appointed under section 638 of the Code of Civil Procedure is subject to review as if made by the court, and in that context the referee's findings of fact have "the effect of a special verdict."  (Civ. Proc. Code, § 645.)  In this case, the special master was not appointed pursuant to section 638.  He was appointed under section 639, subdivision (a)(1), which authorizes the court to appoint a referee without the parties' consent to hear or decide an issue pertaining to a long account.  (Civ. Proc. Code, § 639.)  In this situation, the court had the option to "adopt the referee's recommendations, in whole or in part, after independently considering the referee's findings and any objections and responses thereto

filed with the court." (Civ. Proc. Code, § 644, subd. (b).) Therefore, the special master's findings are not treated like a special verdict for purposes of our review.

In any event, we are unpersuaded by Winston's factual claim that the order accepting Robin's accounting contradicts the special master's findings. Winston appears to make three distinct arguments in support of this claim. First, he posits that the special master made a finding that Robin's accounting was "of 'no use' and 'defective,' " which contradicts the trial court's decision to " 'accept' " the accounting. The special master identified deficiencies in the accounting and proposed a formula for penalizing Robin for breaching her duty to maintain adequate records, but he did not find that the accounting was of no use or recommend that it be rejected.[2] Instead, he recommended no damages against Robin only because "[t]he compensation due" her for services rendered to Estelle and the trust "far exceeds the liability that could be imposed under *McCabe* for defects in the Accounting."

Winston's second argument is similar to his first, although purportedly based on an internal inconsistency in the special master's report. According to this argument, the finding that Robin is entitled to compensation for her services is inconsistent with the finding that Robin's accounting is unbalanced, has gaps and contains inadequate descriptions. We see nothing inconsistent in finding that Robin breached her duty to account and also finding that Robin is entitled to compensation for her eight years of service as Estelle's trustee, conservator and caretaker, especially in light of the 50 percent discount the special master employed in calculating a fee for Robin's

---

[2] In a separate part of his report addressing requests for attorney fees, the special master recommended denying fees to Robin's counsel because, among other things, the accounting prepared by that attorney was defective and did not benefit the trust. Attorney fees are not at issue in this appeal.

services as a trustee. These two rulings involved distinct legal issues and were supported by different sets of facts. Nor was there anything contradictory about recommending that the court offset Robin's liability for breach of her duty to account against the value of services Robin rendered to Estelle. "The remedies of a beneficiary against the trustee are exclusively in equity" (§ 16421) and " 'a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered.' " (*Plut*, *supra*, 85 Cal.App.4th at p. 106.)

Finally, Winston argues that the trial court created an irreconcilable contradiction in its order by invoking latches to bar Winston's claims and at the same time granting Winston's request to surcharge Robin. The trial court did not bar all of Winston's claims on the basis of laches, but only those seeking to hold Robin liable for mismanaging the trust properties. The court granted the surcharge petition in part and adopted findings sustaining objections to the accounting. The laches ruling, which established an alternative ground for rejecting Winston's mismanagement claim, does not conflict with any other ruling in the order settling Robin's accounting.

In a related argument, Winston disputes the finding that his mismanagement claim is barred by laches, arguing that the elements of this doctrine were not proven, and that laches does not apply to him as a matter of law. " ' "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." ' " (*Drake v. Pinkham* (2013) 217 Cal.App.4th 400, 406.)

The special master did not make findings as to whether this doctrine should apply. However, the June 2019 order is not based solely on the special

master's findings. The trial court also considered the parties' responses to the special master's report as well as the recommendations of Estelle's GAL, Jonna Thomas. Thomas acknowledged that Robin did not meet all of her obligations as trustee, but asked the court to excuse Robin's errors because she served Estelle "dutifully, in good faith and without accepting compensation due to her for over 10 years." Thomas also recommended denying Winston's objections and surcharge petition because he acted with unclean hands and should be barred by laches. Thomas based her recommendation on Winston's testimony at the evidentiary hearing, which showed that he exercised de facto control over Ocean View, entered the property without Robin's authorization, and enabled Stewart's wrongful occupation, all of which prevented Robin from resolving the trust's cash-flow problems. Winston also waited more than eight years to exercise his right to demand an accounting, thus compromising Robin's ability to defend her acts. In the June 2019 order, the trial court adopted the GAL's recommendation and also observed that Winston is a licensed plumber and property owner who inexplicably "waited until 2017 to intervene" in the trust proceedings. This evidence sufficiently supports the finding that Winston should be barred by laches from claiming that Robin mismanaged the trust properties. That the GAL for Estelle was the one urging laches also refutes Winston's attempt to defeat the court's finding on the basis that he was bringing his claims on his mother's, not his own, behalf.

Citing *Conservatorship of Coffey* (1986) 186 Cal.App.3d 1431, Winston contends that, as a matter of law, the doctrine of laches did not bar his claims against Robin. In *Coffey*, a conservator failed to pay a premium due on the conservatee's life insurance policy, causing it to lapse. Thereafter, the conservator resigned his post and filed a final accounting that did not list the

policy as an estate asset or disclose that it had lapsed. Several months later, the conservatee died and when the decedent's beneficiary discovered the lapsed policy, he brought a successful action to surcharge the former conservator. On appeal, the former conservator argued that the beneficiary was "guilty of contributory fault" because he failed to warn the former conservator about the need to pay the premium or to take other steps to ensure it was paid. (*Id*. at p. 1442.) Rejecting this contention, the *Coffey* court declined to impose a duty on a beneficiary to oversee the activities of a conservator, and held that the former conservator's liability arose from the breach of his statutory duty to conserve an estate asset. (*Id*. at p. 1443.) *Coffey* has no application here, where the trial court imposed no duty on Winston, but found only that he is subject to the equitable defense of laches.

Even if the trial court should not have applied the laches doctrine, we would affirm its June 2019 order. The special master found that Robin did not commit a breach of trust by administering the trust with the vacancies, that even if Robin had a duty to make all properties productive, she did not breach that duty, and that even if Robin did breach such a duty, she should be relieved of liability because she acted reasonably and in good faith. The trial court adopted all of these findings, each of which establishes an independent basis for rejecting Winston's claim that Robin is liable for $1,100,000 in lost rents.

## DISPOSITION

The July 2019 order is affirmed. Respondent, Liberty Mutual, is awarded costs on appeal.

TUCHER, J.

WE CONCUR:

STREETER, Acting P. J.
BROWN, J.