Filed 10/17/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ORANGE CATHOLIC FOUNDATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ROSIE MARY ARVIZU, as Trustee, etc., <br><br> Defendant and Respondent. | G055189 <br><br> (Super. Ct. No. 30-2014-00753823) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge. Affirmed.

Baker & Baker, William E. Baker, Jr., and Brook John Changala for Plaintiffs and Appellants.

Buffington Law Firm, Roger J. Buffington, Kaden J. Kennedy, and Brooke A. Buchanan for Defendant and Respondent.

\*        \*        \*

Probate Code section 16440, subdivision (b) (16440(b)) provides that if a "trustee has acted *reasonably and in good faith* under the circumstances as known to the trustee," a court has discretion to excuse him or her from liability for a breach of trust if it would be equitable to do so.[1] (Italics added.) Acting under this express authority, the trial court denied a petition brought by Orange Catholic Foundation[2] and Kevin W. Vann, the Roman Catholic Bishop of Orange (collectively, the Church) to remove Rosie Mary Arvizu from her position as trustee of the Josephine Kennedy Trust (Trust) and for damages. Finding no abuse of discretion, we affirm the judgment.

The Trust gave a life estate in Kennedy's house (the Residence) to Paul Senez, her very dear family friend of over 60 years, provided that he pay for certain expenses related to the Residence. The Trust further provided that upon Senez's death, the Residence was to be sold and the proceeds were to be given to the Church for the benefit of the needy elderly and abused children. The Church alleged that Arvizu (Kennedy's niece and the successor trustee) breached her duties as trustee by: (1) improperly using Trust funds to pay expenses that should have been borne by Senez (who was elderly, destitute, suffering from dementia, and unable to cover the expenses himself); (2) failing to evict Senez when he could not pay those expenses; and (3) not promptly renting out or selling the Residence after Senez's death (a delay which occurred in part due to Arvizu's cancer treatment and other health issues, and which fortuitously benefited the Church because the Residence *appreciated* by $136,000 during the period of Arvizu's inaction).

---

[1] All further undesignated statutory references are to the Probate Code.

[2] Orange Catholic Foundation is a not-for-profit corporation that administers all gifts for the Roman Catholic Diocese of Orange. The Roman Catholic Bishop of Orange appointed and authorized Orange Catholic Foundation to litigate this petition on the Church's behalf.

The trial court denied the Church's petition, invoking its equitable power under section 16440(b) to excuse Arvizu from liability. The court observed that the Church's argument that Senez should have been evicted, while perhaps technically correct, is "both unrealistic and not particularly charitable." The court went on: "How could Arvizu in good conscience boot out a man who essentially was a member of her family, had lived in the house for 40 years, was suffering from dementia and had minimal financial assets? . . . Under the circumstances, it is hard to imagine that anyone would take that step." As detailed below, we conclude that substantial evidence supported the trial court's finding that Arvizu acted reasonably and in good faith, and we find no abuse of discretion in the trial court's exercise of its equitable powers under section 16440(b).

I

FACTS AND PROCEDURAL HISTORY

A.     *The Parties and the Trust*

Senez was a longtime friend of the Kennedy family. Although not related to the Kennedys by blood, he was considered a member of the family, spent holidays with them, and was affectionately known as "Uncle." He lived with the Kennedy family for 60 years, including 40 years spent at the Residence. When Kennedy's husband was alive, Senez worked as a driver for his extermination business. After Kennedy's husband passed away, Senez continued to live with Kennedy at the Residence and took care of her in her old age. Kennedy treated Senez like a son.

Kennedy established the Trust in 1997, naming herself as Trustee. Article II-B(2) and (3) of the Trust provided that upon her death, "[¶] . . . [¶] (2) The Trustee shall retain, IN TRUST, all of the Trustor's interest in the [Residence]…, for the use and benefit of PAUL A. SENEZ for the remainder of his life; provided, however, that during the period that PAUL A. SENEZ is residing in said residence, he shall be responsible for payment of all expenses incurred in the upkeep of said residence, including but not

3

limited to mortgage payments, taxes, utilities, insurance, and any other expenses which may be incurred.  Upon the death of PAUL A. SENEZ, or in the event he shall choose not to reside in said residence, the property shall be sold and distributed as set forth in paragraph (3) below.  [¶]  (3) The Trustee shall distribute the rest, residue and remainder of the Trust Estate to the ORANGE COUNTY CATHOLIC DIOCESE, to be used for the benefit of abused and needy children and the needy elderly, as said Diocese shall determine."

In 2003, Kennedy executed a Second Amended Declaration of Trust.  That Amendment repeated most of the above language, with the exception of the sentence in Article II-B(2) stating what financial responsibilities Senez would have while living in the Residence.  The revised language removed any obligation to pay mortgage payments and required Senez to pay only for "ordinary maintenance expenses" (as opposed to "any other expenses which may be incurred").

The Trust named Kennedy's niece, Arvizu, as the successor trustee. Kennedy and Arvizu were very close, and Arvizu regarded Kennedy as a mother and confidant.  Over the years, Arvizu and Kennedy had many discussions about Kennedy's intentions and desires concerning the Trust, and in light of those conversations, Arvizu believed that Kennedy expected her to look after Senez and pay for certain expenses if he was unable to pay for them himself.  According to Arvizu, Kennedy repeatedly told her to take care of Senez, to help him keep the property up, and to pay for Senez's cremation and funeral using Trust assets.  Based on their conversations, Arvizu also believed that her aunt wanted her to ensure that Senez (a Korean War veteran) was buried in a veterans' cemetery.

*B.     Senez's Last Few Years in the Residence*

Kennedy died in 2007 at the age of 100.  Arvizu, who was in her 70s by then and neither legally nor financially sophisticated,[3] became trustee.  She retained the same attorney who had prepared the Trust to advise her in administering the Trust, and the attorney gave her instructions regarding her duties as trustee.

Senez was living in the Residence when Kennedy died (as he had been for decades), and unfortunately, he was not in a position to live by himself.  He was elderly; he was also in failing health and displaying signs of dementia.  Arvizu offered Senez a room in her house, but he became irate and replied that he would stay in the house where he had lived for 40 years until he died.

At some point, Arvizu's estranged daughter, Mary Ann, who was very close with Senez, moved into the Residence to help take care of him.  She did so without permission from or even telling Arvizu, although Arvizu eventually learned that Mary Ann was living at the Residence.  Mary Ann bathed and fed Senez, helped him with his medications, ran errands for him, monitored his medication, cleaned the house, and paid his bills.  His dementia progressed to the point that if he was not monitored, he would wander off by himself, so Mary Ann prevented him from doing so.

Senez could not afford the expenses associated with living in the Residence.  Thus, even though the Trust expressly required Senez to pay for certain expenses associated with the Residence, and even though Arvizu understood that the Trust required Senez to pay for those expenses, Arvizu paid Senez's bills using Trust assets.  Arvizu testified that she "thought [she] was doing the right thing," that she "did what [her] aunt wanted [her] to do," and that in her mind, these payments were justified

---

[3] Arvizu has an 11th grade education, and she worked as a beautician for a few years and then as an assembler for TRW for many years.

by the multiple statements Kennedy had made before her death that Arvizu should take care of Senez.

According to the Church, Arvizu spent $44,416 of Trust assets to pay expenses that should have been borne by Senez. The trial court found that these expenses fell into two main categories: (1) expenses that clearly benefited the Residence, and (2) expenses that were personal to Senez. The first category of expenses, which totaled $40,208, included items such as property taxes and homeowners association dues; the trial court found that Arvizu credibly testified that she paid those expenses to avoid foreclosure.[4] The second category of expenses, which totaled $4,208, included items such as Senez's car payments, auto insurance, utilities, and (after his death) his funeral expenses, all of which the trial court found should *not* have been paid by the Trust.

### C. *Arvizu's Delay in Selling the Residence*

Senez died in October 2012. On the day of his wake, Arvizu told Mary Ann that she needed to move out of the Residence. Mary Ann replied that she would do so but that she needed some time, and Arvizu believed her.

As it turned out, Mary Ann remained in the Residence for nearly two years after Senez's death, despite her mother's repeated requests that she move out. According to Mary Ann, it took her awhile to find a place to live. Arvizu did not act more decisively in evicting her daughter, in part because Arvizu was in and out of the hospital due to her own health problems (including breast cancer treatment and a knee surgery). Arvizu was also caring for her ill husband, who had a tumor.

---

[4] Arvizu's attorney testified along similar lines: she said that paying those expenses (as opposed to filing a section 17200 petition for instructions and waiting months for an outcome) preserved Trust assets and benefited the Trust by avoiding additional penalties, liens, and foreclosure.

During that two-year period, Arvizu did not collect rent from Mary Ann. According to the Church, the reasonable rental value of the Residence was about $2,900 per month (assuming the Residence was in average condition, which does not appear to have been the case). Thus, claimed the Church, the Trust lost about $70,000 in lost rent during that period.

Arvizu eventually involved her attorney, who wrote a letter to Mary Ann in July 2014 threatening her with legal action if she did not move out of the Residence. Mary Ann vacated the Residence the following month. By October, a realtor prepared a listing agreement for the Residence, which by then was in *extremely* poor condition and required extensive clean up and repairs.[5] Arvizu was cooperative in selling the Residence, which eventually sold in March 2015 for $546,000.

Despite the lost rent, Arvizu's two-year delay in putting the Residence on the market proved to be very beneficial to the Trust. It is undisputed that the market value of the Residence increased from $410,000 in November 2012 (the month after Senez died) to $546,000 in March 2015 (when the Residence was finally sold) as a result of the real estate market going up. This $136,000 increase greatly exceeded the alleged lost rent of $70,000. Arvizu gave the proceeds from the sale of the house to the Church in accordance with the terms of the Trust.

D.     *Proceedings in the Trial Court*

The Church filed a verified petition to remove and replace Arvizu and for damages for breach of trust and breach of fiduciary duty. After a two-day bench trial, the trial court issued an eight-page written decision denying the Church's petition. In its

---

[5] The testimony at trial was inconsistent as to when exactly the Residence became so deteriorated — before Kennedy's death (pre-2007), after Kennedy's death but before Senez's death (2007-2012), or after Senez's death when Mary Ann was living at the Residence alone (2012-2014).

7

findings of fact, the court concluded that Arvizu "plainly decided to act in a way that she believed carried out the wishes of her Aunt (Kennedy) notwithstanding the language of the Trust"; that in Arvizu's mind, the use of Trust funds to pay for various expenses was "justified by statements that had been made to her by Kennedy before her death" about the need to take care of Senez; and that "none of [Arvizu's] actions appear to have been taken to benefit her personally."

The court then reasoned as follows: "There is little question that Arvizu did not follow the exact requirements of the Trust in administering it after Kennedy's death. During the five years that Senez held a life estate in the Residence, she used Trust assets to pay both expenses that Senez was supposed to pay and some of his personal expenses. After his death in 2012, she failed to act promptly in selling the property and then turning the proceeds over to the Church. Further, during the two year period of delay, she did not rent the property, instead allowing her estranged daughter to remain there rent-free. This conduct falls below the standard of care required of a trustee by the Probate Code. *See* Probate Code §§ 16002, 16004, 16006, 16007.

"Balanced against these issues are the justifications offered by Arvizu for her actions. As to the payments of property taxes and homeowner association dues, Arvizu legitimately concluded that paying these expenses ultimately would benefit the Trust since possible foreclosure and penalties could be avoided. Other expenses that were plainly personal to Senez were paid not to benefit Arvizu, but to carry out what she believed were her Aunt's wishes.

"Considering these facts, it is difficult to fault Arvizu for her actions—at least up to the time of Senez's death. Thus, in response to the Court's questions at the conclusion of the trial as to what Arvizu should have done when it became clear to her that Senez could not make the payments required by the Trust, the attorney for the Church stated that Arvizu should have evicted Senez and sold the Residence (or simply deeded it over to the Church). While this statement may be technically correct, it strikes

8

the Court as both unrealistic and not particularly charitable. How could Arvizu in good conscience boot out a man who essentially was a member of her family, had lived in the house for 40 years, was suffering from dementia and had minimal financial assets? Given his adamant refusal to move when asked to do so by Arvizu in 2007, her legal remedy would have been to institute an unlawful detainer action against him. Under the circumstances, it is hard to imagine that anyone would take that step.

"As to the two years of rent that Arvizu failed to charge for the Residence, she is somewhat more blameworthy. While it undoubtedly would have been uncomfortable to evict her daughter immediately after Senez's death, Arvizu, as the Trustee, was required to do whatever was reasonably necessary to preserve all Trust assets. Other than her own ill health and the obvious difficult dynamics of her relationship with Mary Ann, Arvizu presented no legitimate justification for her actions.

"That being said, the loss of $69,600 in rent is more than offset by the $136,000 increase in the value of the Residence as a result of the delayed sale. This increase in value also more than covers any of Senez's purportedly unauthorized expenses paid by the Trust. . . .

"Here, the total financial losses that resulted from Arvizu (1) paying unauthorized expenses for Senez, (2) delaying the sale of the property and (3) not renting the Residence are offset or mitigated by the increase in the value of the property between the date of Senez's death in 2012 and the sale of the property in 2015. Given this appreciation, the Church is hard-pressed to demonstrate any real losses attributable to Arvizu's actions.

". . . [I]t is well-settled that the remedies of trust beneficiaries are equitable in nature. (Rest. 3d of Trusts, §95.) Indeed, Probate Code Section 16440(b) provides in pertinent part as follows: '*If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so.*'

9

(Emphasis added.)  As set forth above, the evidence strongly supports the conclusion that Arvizu acted reasonably and in good faith under the unique circumstances of the case. Significantly, at no time did she take any actions designed to benefit herself personally. Further, although some of her actions were in contravention of the precise wording of the Trust, all of Arvizu's actions were, at least in her mind, consistent with the wishes of her aunt, the trustor."

For the above reasons, the trial court denied the Church's petition.  It then entered a judgment denying the Church's petition, deeming the Trust fully distributed, and dissolving the Trust.  The Church appealed the judgment, arguing (among other things) that the trial court erred in using its equitable powers to excuse Arvizu's breaches.

II

DISCUSSION

A.    *Standard of Review*

The parties dispute the applicable standard of review.  Multiple standards are applicable here.

We review the trial court's findings of fact, including its factual findings on witness credibility and whether Arvizu acted reasonably and in good faith, under the substantial evidence standard of review.  (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299; *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.) Under this standard, "our review begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below." (*Williamson*, at p. 1299.)  "In assessing whether any substantial evidence exists, we view the record in the light most favorable to respondents, giving them the benefit of every reasonable inference and resolving all conflicts in their favor."  (*Ibid.*)  "'[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to

10

support it.'" (*Id.* at p. 1300.) Where multiple inferences can be drawn from the evidence, we defer to the trial court's findings. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) "If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

We review the trial court's exercise of its equitable powers — including its decision to excuse a trustee for breach of trust under section 16440(b) — for abuse of discretion. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256; *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 911.) "An abuse of discretion occurs only if the reviewing court, considering the applicable law and all of the relevant circumstances, concludes that the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice." (*Ibid.*) In applying the abuse of discretion standard, "we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision '"falls within the permissible range of options set by the legal criteria."'" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771.) We may reverse only if the trial court's decision "'exceeds the bounds of reason, all of the circumstances before it being considered.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

## B.     *The Court's Equitable Powers Under Section 16440*

"The remedies of a beneficiary against the trustee are exclusively in equity." (§ 16421; see Rest.3d Trusts, § 95 ["With limited exceptions, the remedies of trust beneficiaries are equitable in character and enforceable against trustees in a court exercising equity powers"].) This is significant, because it means that "wide play is reserved to the court's conscience in formulating its decrees." (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1133.)

Equity ""has its origins in the necessity for exceptions to the application of rules of law in those cases where the law, by reason of its universality, would create

11

injustice in the affairs of men.""" (*Lickiss v. Financial Industry Regulatory Authority*, *supra*, 208 Cal.App.4th at p. 1133.) "The equitable powers of a court are not curbed by rigid rules of law," but rather "are broad enough to address novel conditions and meet the requirements of every case." (*Ibid*.) "In other words, equity recognizes that we live in a changing world and equitable remedies are flexible, capable of expanding to meet the increasing complexities of these changing times." (*Ibid*.) "The object of equity is to do right and justice. It 'does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.'" (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 770.)

Consistent with the equitable nature of a beneficiary's remedies, section 16440 gives trial courts wide latitude in deciding whether and what types of damages to impose on a trustee who commits a breach of trust (which section 16400 defines as a "violation by the trustee of any duty that the trustee owes the beneficiary").[6] Subdivision (a) authorizes the trial court to determine which of three measures of liability provided in the statute "is appropriate under the circumstances," and subdivision (b) gives the court discretion to excuse the trustee from liability for any breach of trust that he or she committed reasonably and in good faith, if it would be equitable to do so. (§ 16440; see *Borissoff v. Taylor & Faust* (2004) 33 Cal.4th 523, 532 [noting that subdivision (b) "permits courts to excuse from liability fiduciaries who have acted reasonably and in good faith under the circumstances as known to the fiduciary"].)

---

[6] The statute provides in full: "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. (2) Any profit made by the trustee through the breach of trust, with interest. (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust. (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so." (§ 16440.)

12

In enacting subdivision (b), our Legislature codified the "good faith" exception contained in the Restatement Second of Trusts (§ 205, com. g), which stated in pertinent part that "a court of equity may have power to excuse the trustee in whole or in part from liability where he has acted honestly and reasonably and ought fairly to be excused." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (2011 ed.) § 16440, pp. 265-266; see Rest.3d Trusts, § 95, com. d ["If . . . the court concludes that, in the circumstances, it would be unfair or unduly harsh to require the trustee to pay, or pay in full, the liability that would normally result from a breach of trust, the court has equitable authority to excuse the trustee in whole or in part from having to pay that liability"].)

## C.    *The Trial Court Did Not Abuse Its Discretion in Excusing Arvizu*

Given the language of section 16440(b), a threshold question is whether there was substantial evidence to support the trial court's factual findings of reasonableness and good faith. We conclude there was.

With regard to the payment of Senez's expenses, Arvizu testified that she believed that she was doing the right thing and acting in accordance with her aunt's instructions to take care of Senez. The vast majority of those expenses ($40,208 of the $44,416 paid) benefited the Residence, and the trial court found that Arvizu credibly testified that she paid those expenses to avoid foreclosure. Importantly, this was not a case of self-dealing by a trustee, and none of Arvizu's actions appeared to have been taken to benefit her personally.

As for the delay in selling the Residence and the concurrent failure to collect rent, Arvizu's testimony regarding her failing health and hospitalizations supported the trial court's conclusion that her inaction, though below the standard of care and "somewhat more blameworthy," was neither unreasonable nor done in bad faith. It is not our role to reweigh the evidence or redetermine the credibility of the witnesses, and

13

we will not disturb the trial court's factual findings of reasonableness and good faith where, as here, there is substantial evidence to support them.  (*Williamson v. Brooks*, *supra*, 7 Cal.App.5th at pp. 1299-1300; see *In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175 ["An adverse factual finding is a poor platform upon which to predicate reversible error"].)

Given its findings of reasonableness and good faith, section 16440(b) afforded the trial court broad discretion to excuse Arvizu from liability, and we find no abuse of discretion in the trial court's decision to do so.  (Contrast *Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at pp. 906-907 [finding that subdivision (b) did not apply because the trustee had acted in bad faith by serving his own interests].)  Since the determination of the appropriate relief in a trust dispute is exclusively a matter in equity (§ 16421), the relief afforded to the parties is properly left to the trial court for determination and generally should not be disturbed on appeal.  (*Rivero v. Thomas* (1948) 86 Cal.App.2d 225, 238 ["The matter of determining the appropriate equitable relief to be granted to a beneficiary is generally left to the good judgment of the trial court.  If the method is in accordance with an applicable law, the trial court's judgment should prevail"].)  Having heard the entire case and observed the demeanor of the witnesses, the trial court was in a far better position than we are to apply equitable principles to its factual findings.  We will not supplant our judgment for that of the trial court, particularly considering that its decision to excuse liability squarely fell """"within the permissible range of options"""" set forth in section 16440.  (*Hirshfield v. Schwartz*, *supra*, 91 Cal.App.4th at p. 771.)

The Church colorfully argues on appeal that the trial court could not use its equitable powers to excuse Arvizu's conduct because her treatment of Senez was "objectively despicable," "reprehensible," and amounted to "clear and patent elder abuse."  More specifically, the Church asserts that Arvizu immorally abandoned a veteran with senile dementia by leaving him "to languish in filth" with Arvizu's dangerous and estranged daughter, rather than getting him the help he needed at "the V.A."

14

There are many problems with this argument. First, it is speculative and not supported by the record. Despite the Church's attempts at trial to paint Mary Ann as an unsavory individual, there was no evidence that Mary Ann ever physically mistreated or abused Senez; there was conflicting evidence at trial as to when exactly the Residence became so deteriorated to the point of being uninhabitable (i.e., whether that happened before or after Senez's death); and there was no evidence at trial concerning what veterans benefits, if any, Senez would have been entitled to had he applied, or how those benefits could have helped his situation. To the contrary, the evidence at trial overwhelmingly indicated that Arvizu was trying to do the right thing by letting Senez stay in the house he had lived in for over 40 years, and that Mary Ann generally *helped* Senez's situation. The Church's contention on appeal about Senez allegedly being mistreated is inconsistent with the position it took at trial, where the Church repeatedly advocated that Arvizu should have *evicted* Senez (in the words of the Church's counsel, "kick him out"), even though he was senile and destitute with no means to care for himself.

The Church also asserts on appeal that Arvizu "misappropriated money to be used for needy children and the elderly to help out her uncle," and that the trial court's ruling "came at a cost to the actual beneficiaries of the Kennedy's Trust Estate – the elderly and children to which she left it." This argument also falls flat. As noted above, the vast majority (over 90%) of expenses paid out of Trust assets during Senez's final years in the Residence benefitted the Residence (and hence the Trust, the Church, and the future recipients of any charity) by avoiding foreclosure, liens, and penalties. Further, the Trust sustained no damages as a result of Arvizu's delay in selling the Residence and her

failure to rent it out; to the contrary, the Trust actually made money as a result of the Residence's $136,000 appreciation during the period of Arvizu's inaction.[7]

The Church correctly notes that in exercising its equitable powers, a trial court must consider the equities on both sides of a dispute (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180), but the trial court did just that and concluded that "the Church is hard-pressed to demonstrate any real losses attributable to Arvizu's actions." Indeed, when the trial court inquired at the conclusion of trial how the Church or its charity recipients were damaged by the delay in selling the house, the Church's counsel conceded that he "can't qualify that dollar amount," adding, "who knows what damage was caused by that."

The Church also asserts that Arvizu should not have been rewarded for willfully breaching her fiduciary duties and for willfully disregarding the terms of the Trust. This argument misses the point of section 16440(b), the applicability of which does not turn on whether the trustee acted negligently or willfully. Section 16440(b) gives a trial court discretion to excuse a trustee from liability for *any* breach of trust committed reasonably and in good faith, if it would be equitable to do so. "'Obviously, a decision which simply ignores statutory requirements constitutes an abuse of discretion.'" (*People v. Superior Court (Martinez)* (2002) 104 Cal.App.4th 692, 697.) But here the trial court did not *ignore* statutory requirements; instead, it acted within the express authority of section 16440(b).

In affirming the judgment, we certainly do not mean to suggest the trial court was *required* to excuse Arvizu's conduct, or that a trustee who has acted reasonably

---

[7] There were thus no damages available for Arvizu's inaction: there was no "loss or depreciation in value of the trust estate," no "profit made by the trustee," and no lost "profit that would have accrued to the trust estate." (§ 16440(a); see Rest.3d Trusts, § 101 [allowing trustee's liability for breach to be reduced by a profit if "the acts of misconduct causing the loss and the profit constitute a single breach"].)

and in good faith must *always* be relieved from liability for committing a breach of trust, or that a trustee *always* has free reign to ignore trust terms in the name of doing the "right thing." We hold only that the trial court had discretion to excuse Arvizu under section 16440(b), and given that substantial evidence supported the trial court's findings of good faith and reasonableness, we find no abuse of that discretion.[8]

IV

DISPOSITION

The judgment is affirmed. Arvizu shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.

---

[8] In light of our holding that section 16440(b) supported the trial court's decision to excuse Arvizu from liability, we need not address the other issues raised by the Church on appeal. We affirm a trial court's ruling if correct for any reason. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19.)