Filed 12/16/21  Sonntag v. DeMartini CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DEBORAH SONNTAG, et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>STEVEN DEMARTINI, et al.,<br><br>        Defendants and Respondents. | A160247<br><br>(Marin County<br>Super. Ct. No.<br>CIV1701027,<br>PRO1800579) |

This appeal arises out of a dispute among four siblings over a distribution of trust proceeds.  The siblings are all beneficiaries of the Ronald DeMartini Exemption Trust (exemption trust), and one sibling, Steven DeMartini, is the designated successor trustee of that trust.[1]

Siblings Deborah Sonntag and Loriann DeMartini brought two actions against Steven and their sister Gaylyn DeMartini.  One was a civil action against Gaylyn, individually and in her role as executor of their mother's will, alleging she had acted as a "de facto [c]o-[t]rustee" of the exemption trust, and as such had breached her fiduciary duty to Deborah and Loriann by retaining the proceeds of a loan encumbering exemption trust property in her mother's estate.  The second action, against both Gaylyn and Steven, was a

---

[1] We refer to the siblings by their first names to avoid confusion.

1

probate petition to compel redress of alleged breaches of trust and to remove Steven as the trustee of the exemption trust.

The two actions were eventually consolidated, and following a 15-day trial, the trial court concluded Gaylyn acted as a de facto trustee of the exemption trust for about six months following her mother's death. The court further found that neither Gaylyn nor Steven breached their fiduciary duties and, even if they had, no damages resulted from the alleged breaches. We affirm.

## BACKGROUND

The exemption trust followed from the establishment of the "Ronald P. DeMartini and Joyce E. DeMartini Family Trust" (family trust) created by the siblings' parents in 1993. That trust provided that after the death of the first parent, the trust would be divided into two separate trusts, "designated the survivor's trust and the exemption trust." The surviving parent had the power to "amend, revoke, or terminate the survivor's trust; but the exemption trust [could] not be amended, revoked, or terminated."

The family trust provided that when the surviving parent died, "the Trustees shall add to the exemption trust any portion of the survivor's trust not disposed of and shall then distribute to the children . . . in equal shares, all assets of the exemption trust, together with any and all undistributed income."

Ronald DeMartini died in 1994, and the family trust was duly split in two—the exemption trust being irrevocable, with each of the four siblings holding equal interests in the remainder.

Joyce DeMartini became the successor trustee of both the survivor's trust and the exemption trust.

As the trustee of the survivor's trust, Joyce was authorized to pay herself, as the surviving spouse, the income from the trust, and could also pay any "sums from the principal . . . in the Trustees' discretion, consider[ed] necessary for the surviving spouse's proper health, support, comfort, enjoyment, and welfare." The trust also provided the trustee "shall pay the surviving spouse as much of the principal . . . as he or she shall request in writing."

As the trustee of the exemption trust, Joyce was authorized to pay herself, as the surviving spouse, the income from the exemption trust "in all sums and in any proportion that may be necessary, in the Trustees' discretion, for . . . her health, education, support, and maintenance. . . ." If the trustee considered the income insufficient, she had discretion to pay "all sums from the principal as [she] . . . consider[ed] necessary for the beneficiary's proper health, education, support and maintenance. . . ." Although "[p]ayments from principal to the surviving spouse shall be made first from the survivor's trust until it is exhausted and thereafter from the exemption trust, . . . all or any part of those payments may be made from the exemption trust without exhausting the survivor's trust if the Trustees consider it advisable."

The trust instrument provided that on the surviving spouse's death, "if and to the extent that the surviving spouse shall not have effectively disposed of all property of the trust estate of the survivor's trust through a valid and effective exercise of a power of appointment, all of the remaining assets of the trust shall be distributed to the then-acting trustees of the exemption trust to be added to and form part of the assets of the exemption trust. . . ."

In 2012, Joyce executed a revised will and an amendment to the survivor's trust, by which she excluded Deborah and Loriann as beneficiaries

3

of her estate and that trust.  Joyce named Gaylyn and Steven as the beneficiaries of both.

In 2013, Joyce amended the survivor's trust to appoint Gaylyn as co-trustee.  Joyce also executed an agency agreement authorizing Gaylyn to act on Joyce's behalf with respect to the exemption trust.

By the end of 2013, Joyce's financial circumstances had become reduced.  She had moved into a retirement home, increasing her monthly expenses.  She was also involved in litigation with her sister-in-law, Patricia Ryerson (Ryerson), regarding a Forestville rental property they owned together, and was receiving less income as a result.

In 2014, Joyce took out a $258,000 mortgage on a Novato property, which was part of the exemption trust.  The net proceeds of the cash-out refinance amounted to $220,286.82.  Joyce used some of those funds to pay her expenses and loaned or gave $9,000 to her granddaughter Jessica Rankin (Loriann's daughter).

The proceeds of the Novato loan were deposited into a checking account held by the survivor's trust, of which Joyce and Gaylyn were the trustees.  Joyce then transferred $200,000 from that account into a separate account in her name, alone.

Joyce died in 2015.  At the time of her death, the property held in the exemption trust included a 100 percent interest in the mortgaged Novato property, a 50 percent interest in a commercial rental property in Walnut Creek, and a 50 percent interest in a property in Petaluma.  Joyce's sister owned the other 50 percent of the Walnut Creek property, and Ryerson, Joyce's sister-in-law, owned the other 50 percent interest in the Petaluma property.

4

At the time of Joyce's death, there was about $189,000 remaining of the Novato loan proceeds, held in her separate account.

Gaylyn became the successor trustee of the survivor's trust, of which she was a beneficiary. She was also the executor and a beneficiary of Joyce's will.

Although Steven was the successor trustee of the exemption trust, Gaylyn also managed that trust for six months following Joyce's death. According to Steven, Gaylyn managed the exemption trust with his "expressed consent" because she had more experience handling "matters like these."

Prior to Joyce's death, she and Ryerson had agreed to a title 26 United States Code section 1031 exchange of certain real property. Specifically, Joyce agreed to sell the exemption trust's 50 percent interest in the Petaluma property to Ryerson, and Ryerson agreed to sell her 50 percent interest in a property located in Forestville to Joyce as trustee of the exemption trust, along with making an equalizing payment of $40,000. After Joyce's death, Steven, as the successor trustee, completed the exchange. As a result, a 50 percent interest in the Forestville property was owned by the survivor's trust, and the other 50 percent interest was owned by the exemption trust, and the Petaluma property ceased to be an exemption trust asset.

Steven also obtained appraisals of the exemption trust's interests in the Novato and Walnut Creek properties. The appraiser valued the 50 percent interest in the Walnut Creek property at $787,500, and the Novato property at $800,000 (or $550,333 in light of the loan). As to the interest in the Forestville property, Steven used the "agreed-upon sales price between [Joyce] and [Ryerson]" in the title 26 United States Code section 1031 exchange, of which half was $202,500.

5

In distributing the exemption trust property, Steven distributed interests in the Novato and Forestville properties, valued collectively at $752,833, to Gaylyn and himself, and distributed the 50 percent interest in the Walnut Creek property, valued at $787,500, to Deborah and Loriann, with an equalizing payment to be made to him and Gaylyn.

Deborah and Loriann asked Steven, in his capacity as trustee of the exemption trust, to investigate the circumstances of the Novato property loan, but he declined to do so. He explained his decision-making in a September 29, 2016 letter to his siblings: "I was not aware of Mom taking out a loan on the Novato property until I took active management of the Exemption Trust. [¶] . . . [¶] What I do know is this: [¶] Mom increased the value of the Exemption Trust by over 150% [¶] Mom was in a legal dispute for over 4 years [¶] Mom's income was reduced when Forestville was forced vacant by Pat Ryerson. [¶] Mom moved into an assisted living facility which financially impacted her. [¶] Mom was within her rights to encumber Exemption Trust assets. [¶] The reason that Mom encumbered Novato died with her. [¶] Mom was a generous woman who helped out the family financially. [¶] Knowing this and Mom, I do not see a pattern of abuse and therefore cannot justify the time and expense of pursuing the reason for the encumbrance of Novato, especially when the only person who knew the reason died."

Deborah and Loriann then filed a civil action against Gaylyn, individually and as executor of Joyce's estate, for breach of trust, conspiracy to breach trust, and intentional interference with economic advantage, and sought imposition of a constructive trust. The complaint also alleged Joyce had breached her fiduciary duties by encumbering the Novato property, and conspired with Gaylyn to do so. They additionally filed a probate petition for

6

"redress of breach of trust and for removal of trustee" against both Gaylyn and Steven. (Capitalization omitted.) They alleged Gaylyn, as de facto trustee of the exemption trust, and Steven, as successor trustee, had breached their fiduciary duties in relation to the Novato loan. They also alleged Steven's distribution of trust assets was unequal.

After settlement negotiations broke down, Steven filed a Probate Code section 850[2] petition seeking to have the remaining Novato loan proceeds transferred to the exemption trust. Gaylyn filed a consent to the transfer and agreed to transfer the $189,758.96 remaining balance in Joyce's personal bank account to the exemption trust. Gaylyn explained, however, that her consent was an effort to resolve the litigation with her sisters, not a concession that the Novato loan proceeds had been wrongfully transferred from the exemption trust. She stated in her reply memo "the 850 Petition simply represents Steven and Gaylyn's attempt to anticipate the most that Deborah and Loriann could possibly derive from a recovery in this litigation and have sought (in Steven's case) and consented to (in Gaylyn's case) an order that should moot the majority of Deborah and Loriann's damages claims. Although Deborah and Loriann's claims are unfounded, it is for these reasons that Steven filed, and Gaylyn consented to, the 850 Petition."

The court granted the petition (the section 850 order) in an order providing, the exemption trust "is entitled to title and ownership of the Bank of Marin account . . . held in the name of Gaylyn . . . Executor of the Estate of Joyce. . . . [¶] Gaylyn . . . is ordered to transfer title and ownership of the Bank of Marin . . . account . . . which holds $189,758.96 . . . to Steven . . . as Trustee of the Exemption Trust." The order further provided, "This Order is

---

[2] All further undesignated statutory references are to the Probate Code.

7

made without prejudice to the rights of any party to pursue additional remedies, damages and defenses in the litigation. . . ."

The return of the Novato funds, however, did not end the litigation. The civil and probate cases were consolidated and proceeded to trial.

Following a 15-day trial, the court issued a 26-page statement of decision. The court found Gaylyn was the de facto trustee of the exemption trust from the date of Joyce's death until April 20, 2016 (when Steven sent a letter to his siblings stating he was " 'taking a more active role as the Trustee of the Exemption Trust' ") and Gaylan therefore had a fiduciary duty to the beneficiaries during that time. However, the court also found neither Joyce, Gaylyn, nor Steven, breached their fiduciary duties to the trust beneficiaries in relation to the Novato property loan proceeds.

The court further found that the loan proceeds had been placed in Joyce's separate bank account and were therefore part of her estate. However, since Gaylyn had transferred the remaining funds to the exemption trust pursuant to the section 850 order ("because she was hoping that if she returned the money . . . this litigation would end"), the court ruled the beneficiaries had, in any event, suffered no damages from any asserted breach of the trustees' fiduciary duties.[3]

The court additionally found the $9,000 loan to granddaughter Jessica Rankin was "not permitted by the terms of the Exemption Trust and each of the beneficiaries is entitled to 25% of it." That amount, however, had also

---

[3] Although the trial court ruled neither Joyce nor Gaylyn violated fiduciary duties by placing the loan proceeds first in the survivor's trust (rather than the exemption trust) and then in Joyce's personal checking account, and the remaining proceeds were therefore properly part of Joyce's estate, Gaylyn never asked for the return of the proceeds and they therefore remained in the exemption trust.

"already been returned to the Exemption Trust [pursuant to the section 850 order] and the Petitioners have been made whole."

The court also found the equalizing payment of $40,000 in relation to the title 26 United States Code section 1031 exchange "was an Exemption Trust asset and not part of Joyce's estate." But, again, because the remaining Novato loan proceeds remained in the exemption trust, the court concluded that "any damages caused by Gaylyn's receipt of those monies have been cured."

As to the valuation of the Walnut Creek property, the court credited expert testimony that if a "fractional share discount" applied, the value of the trust's 50 percent share in the property was $433,125 (the value Deborah and Loriann advocated), rather than $787,500, which was half of the unadjusted appraised value (the value Steven had used). However, because Joyce's sister, the co-owner of the Walnut Creek property, had filed a petition action against Deborah and Loriann and the property had been ordered sold and was on the market for $1,950,000, the court concluded the fractional ownership discount did not apply. The court also concluded that even if the property were overvalued for purposes of the distribution, Steven was not liable to the beneficiaries because the valuation was not the result of any willful misconduct or gross negligence on his part and was legally excusable.[4]

## DISCUSSION

### *The Novato Property Loan Proceeds*

Deborah and Loriann claim that both Gaylyn and Steven breached their fiduciary duties via "their conduct relating to the Novato Loan

---

[4] Gaylyn unsuccessfully sought payment of her attorney fees from the exemption trust based on the court's finding that she was a de facto trustee of that trust for six months. She filed a separate appeal from that order, which we declined to consolidate with the instant appeal.

9

proceeds." As to Gaylyn, they maintain she "wrongfully asserted ownership of the Novato Loan proceeds, [by] claiming they were hers as part of [Joyce's] estate." As to Steven, they assert he wrongfully refused to "pursue recovery of the Novato Loan proceeds and other monies converted by Joyce and Gaylyn."

### Gaylyn

Deborah and Loriann maintain the trial court erred in concluding Gaylyn did not breach her fiduciary duties as de facto trustee of the exemption trust[5] by "retaining the funds representing the proceeds of the Novato loan for herself."

Deborah and Loriann first claim the court's findings in its statement of decision as to Gaylyn "contradicted its prior [section 850] Order determining that the Trust was entitled to the loan proceeds remaining on deposit at the time of Joyce's death." As we have recited, that order stated that the exemption trust "is entitled to title and ownership of Bank of Marin account . . . held in the name of Gaylyn . . . Executor of the Estate of Joyce. . . . [¶] Gaylyn . . . is ordered to transfer title and ownership of Bank of Marin . . . account . . . which holds $189,758.96 . . . to Steven . . . as Trustee of the Exemption Trust." It further provided "This Order is made without prejudice to the rights of any party to pursue additional remedies, damages and defenses in the litigation. . . ."

Deborah and Loriann insist that the section 850 order precluded the court from finding, after trial, that Gaylyn had not breached her fiduciary duties in relation to the Novato property loan proceeds. They claim the

---

[5] The parties do not challenge the trial court's finding that Gaylyn acted as a de facto trustee of the exemption trust for about six months following Joyce's death.

10

court's "revisionist 'findings' " after trial contradicted its "prior Order determining that the Trust was entitled to the loan proceeds remaining on deposit at the time of Joyce's death," and characterize the court as having applied "erroneous legal standards."

Relying on *Cox v. Bonni* (2018) 30 Cal.App.5th 287 (*Cox*), and cases cited therein, Deborah and Loriann assert the court could not "change a prior order" without a motion and providing the parties notice and an opportunity to be heard. In *Cox*, the issue was whether the trial court properly reconsidered an order vacating an arbitration award. (*Id.* at p. 312.) The defendant sought reconsideration, but allegedly did not comply with the requirements of Code of Civil Procedure section 1008.[6] (*Cox*, at pp. 312–313.)

The Court of Appeal held: " '[Code of Civil Procedure] [s]ection 1008, subdivision (a) requires that a motion for reconsideration be based on new or different facts, circumstances, or law. A party seeking reconsideration also must provide a satisfactory explanation for the failure to produce the evidence at an earlier time.' [Citation.] A trial court may not grant a party's motion for reconsideration that does not comply with [Code of Civil Procedure] section 1008. [Citations.] However, [Code of Civil Procedure] section 1008 imposes no limits on 'a court's ability to reconsider its previous

---

[6] Code of Civil Procedure section 1008 provides, in part: "When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown." (Code Civ. Proc., § 1008, subd. (a).)

11

interim orders on its own motion, as long as it gives the parties notice that it may do so and a reasonable opportunity to litigate the question.' [Citation.] [¶] The parties here argue as to whether defendant's motion was based on 'new or different facts, circumstances, or law.' These arguments are beside the point, because it is evident the trial court did not reconsider its order based on any of the purportedly new law or facts in defendant's motion, but on its own realization that its earlier order was in error." (*Cox, supra*, 30 Cal.App.5th at pp. 312–313, italics omitted.)

*Cox* is of no assistance to Deborah and Loriann. Whether Joyce and Gaylyn in fact breached fiduciary duties was not decided by the section 850 order. On the contrary, while Gaylyn consented to entry of the order, she expressly did *not* concede the Novato loan proceeds were wrongfully removed from the exemption trust. Rather, she consented to the section 850 order in an effort to end the litigation with her siblings. The section 850 order determined only that the Novato loan proceeds would be transferred to the exemption trust; there was no substantive finding as to the merits of Deborah and Loriann's breach of fiduciary claims. Indeed, the order expressly contemplated other issues would be resolved at a later date, specifically providing it was entered "without prejudice to the rights of any party to pursue additional remedies, damages and defenses in the litigation."

Accordingly, while the trial court concluded in its statement of decision that the remaining Novato loan proceeds were " 'part of Joyce's estate and properly belonged to Gaylyn, as sole beneficiary of the estate,' " the court did not, as plaintiffs claim, effect "a material change in a prior ruling on the issue." The court neither reconsidered nor changed its section 850 order. And in any case, Gaylyn never sought, and the court never ordered that the

12

remaining proceeds from the Novato loan be returned to Joyce's estate. Accordingly, these proceeds remained in the exemption trust.

Deborah and Loriann also maintain the court erred in finding that "Joyce could use the Exemption Trust assets to pay for her increasing living expenses, and that Joyce's placing of the loan proceeds into an 'easily accessible' account to pay those anticipated expenses was 'prudent.'" They assert "Joyce could not use her potential future need of readily available funds for her health, education, support and maintenance as a pretext to convert exemption trust property to her own, and then leave what was not used for authorized purposes to Gaylen as part of her estate." Thus, they claim the court's determination that the money traceable to the Novato loan proceeds " 'was legally part of Joyce's estate and legally belonged (upon Joyce's death) to Gaylyn' as the sole beneficiary of Joyce's estate" was "error as a matter of law."

The trust instrument provided that Joyce, as the surviving spouse and trustee, was authorized to pay herself the income from the exemption trust "all sums and in any proportion that may be necessary, in the Trustees' discretion, for . . . her health, education, support, and maintenance. . . ." If Joyce considered the income insufficient, she had discretion to pay "all sums from principal as [she] . . . consider[ed] necessary for the beneficiary's proper health, education, support and maintenance. . . ." Although "[p]ayments from principal to the surviving spouse shall be made first from the survivor's trust until it is exhausted and thereafter from the exemption trust, . . . *all or any part of those payments may be made from the exemption trust without exhausting the survivor's trust if the Trustees consider it advisable.*" (Italics added.)

13

The evidence at trial showed that around the time of the loan, Joyce's expenses increased, and her income decreased. Joyce moved into a retirement facility in 2013. To do so, she had to pay an initial fee of about $5,000 and rent of about $5,600 per month. The retirement facility rent was $4,216 more than the mortgage payment on her home. In addition, her income had been reduced because she was in a dispute with Ryerson, the co-owner of the Forestville rental property, who had demanded she evict the tenants in 2013, resulting in no rental income. She and Ryerson had an account relating to that property which required both their signatures to withdraw money. Ryerson approved withdrawal of $7,000 in order for Joyce to move to the retirement home, which did not arrive in time for her move, so Gaylyn paid Joyce's move-in fees. Other than the $7,000, Joyce was not able to draw any money from the property account between 2011 and her death in 2015. Accordingly, ample evidence supports the court's finding that "Joyce's income was insufficient to satisfy her needs for support."[7]

Deborah and Loriann also claim the remaining loan proceeds at Joyce's death were not used "for the purposes authorized by the Trust, and at her death [the balance] properly remained a Trust asset." However, they cite no authority or provision of the trust instrument requiring return of unspent

---

[7] "We review the trial court's findings of fact, including its factual findings on witness credibility and whether [the trustee] acted reasonably and in good faith, under the substantial evidence standard of review. . . . Where multiple inferences can be drawn from the evidence, we defer to the trial court's findings. . . . [¶] We review the trial court's exercise of its equitable powers—including its decision to excuse a trustee for breach of trust under section 16440(b)—for abuse of discretion." (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292 (*Arvizu*).) As Deborah and Loriann concede, "issues of law are reviewed de novo, and a substantial evidence standard of review is applied to issues of fact."

funds that were properly withdrawn for Joyce's "health, education, support, and maintenance."

The trial court ruled "[t]here is nothing that required Joyce to immediately spend any and all money she received from the assets that were distributed to her. The funds were placed in an easily accessible account to pay for Joyce's living expenses. This was prudent. . . . Therefore, this court finds that the money located in the bank account (traceable to the Novato loan proceeds) was legally part of Joyce's estate and rightfully belonged (upon Joyce's death) to Gaylyn."

In any event, the court found that even if Gaylyn initially "wrongfully asserted ownership" of the Novato loan proceeds, the remaining $189,757.96 in loan proceeds had been transferred to, and remained in, the exemption trust. In its statement of decision, the court recited, "In response to Steven's P.C. 850 Petition, Gaylyn agreed to give all of the money that was left in the bank account traceable to the Novato loan proceeds to the Exemption Trust beneficiaries. Gaylyn testified that she believed that the money in the account was rightfully hers because it was part of her mother's estate (she was right). Nonetheless, she testified that she agreed to transfer the money to the Exemption Trust because she was hoping that if she returned the money to the Exemption Trust this litigation would end (she was wrong)."

Deborah and Loriann lastly claim the court erred in concluding the two amounts it found were wrongfully removed from the exemption trust—Joyce's $9,000 loan/gift to Loriann's daughter and the $40,000 equalizing payment made pursuant to the title 26 United States Code section 1031 exchange with Ryerson—need not be returned to the exemption trust because Gaylyn had already transferred the entire remaining balance of the loan proceeds to the trust. However, this claim turns on Deborah's and Loriann's assertion that

15

Gaylan, as a beneficiary of her mother's estate, was not entitled to these proceeds. As we have discussed, the trial court's finding to the contrary is supported by substantial evidence—the remaining loan proceeds were legally a part of Joyce's estate and the fact that Gaylyn voluntarily transferred them to the exemption trust pursuant to the section 850 order and never sought to have them transferred back to the estate, supplied a fund from which offsets for the $9,000 gift and $40,000 equalizing payment were properly made.

### Steven

As to Steven, Deborah and Loriann claim he breached his fiduciary duty by failing to initially "pursue recovery of the Novato Loan proceeds and other monies converted by Joyce and Gaylyn." The loan proceeds we have discussed; the "other monies" were rental payments from exemption trust properties that had been distributed to Joyce.

"Trustees owe all beneficiaries . . . a fiduciary duty. . . . Where a fiduciary relationship exists, there is a duty ' "to act with the utmost good faith for the benefit of the other party. . . ." ' [¶] . . . [¶] A trustee is bound to deal impartially with all beneficiaries [citations], unless the language of the trust provides otherwise. (§ 16000.)" (*Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208 (*Hearst*), italics omitted.)

"If discretion is conferred upon the trustee in the exercise of a power, 'the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment. The mere fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power by the trustee.' " (*Hearst, supra,* 145 Cal.App.4th at p. 1209, italics omitted.)

16

The exemption trust instrument gave the trustee broad powers and discretion. It specifically provided "the Trustees are authorized and empowered in the Trustees' discretion as follows: [¶] . . . [¶] (e) To compromise, submit to arbitration, settle or release (with or without consideration) or otherwise adjust any claims in favor of or against the trusts. . . ."[8] Indeed, the "case law on a trustee's discretion to forebear collection of a debt indicates that failure to collect in full by the due date does not necessarily amount to an abuse of the trustee's discretion." (*Estate of Gilliland* (1977) 73 Cal.App.3d 515, 527.)

Deborah and Loriann's claim is, again, predicated on the assertion the remaining Novato loan proceeds and rental income from exemption trust properties distributed to Joyce before her death[9] were not part of Joyce's estate and should have been returned to the exemption trust. However, we have concluded that the court did not err in determining that these funds were, in fact, properly part of Joyce's estate. Thus, Steven's initial decision

---

[8] The exemption trust further provided a "Trustee under this instrument shall not be liable to a beneficiary, or other person succeeding to the rights of a Trustor, for acts or omissions of the Trustee [or a Co-Trustee or an agent employed by the Trustee], except for willful misconduct or gross negligence." "A Successor Trustee shall not be personally liable under Probate Code section 16403(b) for any act or omission of any predecessor Trustee, except for instances that constitute willful misconduct or gross negligence on the part of the successor Trustee."

[9] The trust provided the trustee "shall pay to or apply for the benefit of the surviving spouse from the net income of the exemption trust all sums . . . in the Trustees' discretion, for his or her health, education, support and maintenance. . . . Any income not distributed shall be added to principal." Deborah and Loriann claim rental payments from exemption trust properties made to Joyce should have been returned to the exemption trust upon her death. As the court found, however, rental payments made prior to Joyce's death had already been "distributed" to Joyce, and thus were properly part of Joyce's estate.

17

not to pursue the funds—for the reasons detailed in his explanatory letter to his siblings—was a proper exercise of his discretion under the trust instrument and not a breach of any fiduciary duty.[10]  Moreover, Steven ultimately did pursue the remaining Novato loan proceeds by filing the section 850 petition and securing Gaylyn's consent to the transfer of the loan proceeds to the exemption trust.

### Equality of Trust Asset Distribution

Deborah and Loriann additionally complain the distribution of the exemption trust assets was unequal because the interest in the Walnut Creek property they received was overvalued.

Steven had the Walnut Creek property appraised by a certified California general real estate appraiser in 2016.  The appraiser valued the property at $1,575,000, making the value of a 50 percent interest, as held by the exemption trust, $787,500.

In 2018, an ADA lawsuit was filed regarding the Walnut Creek property.  The lease for the property required the commercial tenant to pay for any modifications necessary under the ADA.  The parties negotiated a settlement agreement under which the tenant was to have the required modifications made to the property within six months.  The tenant vacated the property in November 2018, and the Walnut Creek property was transferred to Deborah and Loriann before the repairs were made.

Deborah and Loriann claim the ADA issues with the property at the time they took possession reduced its value. Pursuant to the settlement

---

[10]  Contrary to Deborah and Loriann's claim, the trial court's finding that Steven's "web of relationships" was irrelevant to the decision, was not error.

18

agreement, however, the former tenant was required to remedy the problems within six months, thus eliminating any claimed reduction in value.

Deborah and Loriann also claim the 2016 appraisal overvalued the Walnut creek property because it did not apply a fractional discount rate for holding only a 50 percent ownership interest in the property.

At trial, Deborah and Loriann's appraisal expert, Brian Rapela, testified that when appraising a fractional share of real property, a "fractional discount rate" applied. He explained the discount rate is based on "a return that an investor would expect if he were purchasing a 50 percent interest in the subject property." A partial interest in real property is valued lower than the pro rata share due to lack of marketability and lack of control. Thus, he opined a discount rate of 45 percent should apply to the appraised value of the 50 percent interest in the Walnut Creek property, valuing the 50 percent interest at $431,000.

In rebuttal, certified appraiser Nolan Tong testified as an expert in commercial and residential appraisals. He disagreed with Rapela's opinion about the amount of any fractional interest discount and whether a fractional interest discount should be applied to the Walnut Creek property. Tong testified that, given his understanding that the property was to be sold in a partition action, "then a fractional interest valuation would not apply because the whole property would be sold." He explained if the property is "sold as a hundred percent, then the marketability discount goes away." He further testified that if a fractional interest discount applied, his opinion was that the appropriate discount rate was 24.4 percent.

The trial court found Rapela's testimony about the amount of any fractional share discount "more convincing" that that of Tong. "Accordingly, the court adopts Petitioners['] position that *if* the fractional share discount

19

applied, and if a prudent investor were purchasing a 50% interest in the Walnut Creek property, the fractional share discount would be 45% of the pro rata interest and the true value of the property (at the time of distribution) would have been $433,125 and not Steven's assessed value of $787,500." (Italics added.)

However, the court then concluded, along the lines of Tong's testimony, that no fractional share discount applied to the Walnut Creek property valuation because rather than selling a 50 percent share, it was being sold as a whole. "[T]he Walnut Creek property has now been ordered sold [as a result of a partition action filed against Deborah and Loriann by the co-owners of the Walnut Creek property] (with a listing price of $1.95 million dollars); the fractional ownership discount does not apply because once the property is sold, [Deborah and Loriann] will receive 50% of the sales price (ultimately confirming Steven's valuation)." (Fn. omitted.)

Deborah and Loriann contend the court erred because the "trust distributions were required to be equal when made, without regard to subsequent events." They assert the trial court "refused to exercise its powers in equity to recall the distributions for re-allocation."

Section 16421 provides "[t]he remedies of a beneficiary against the trustee are *exclusively in equity*." (Italics added.) " 'With limited exceptions, the remedies of trust beneficiaries are equitable in character and enforceable against trustees in a court exercising equity powers'. . . . This is significant, because it means that 'wide play is reserved to the court's conscience in formulating its decrees.' " (*Arvizu, supra,* 28 Cal.App.5th at p. 293, quoting Rest.3d Trusts, § 95.) "Consistent with the equitable nature of a beneficiary's remedies, section 16440 gives trial courts wide latitude in deciding whether and what types of damages to impose on a trustee who commits a breach of

trust (which § 16400 defines as a 'violation by the trustee of any duty that the trustee owes the beneficiary'). Section16440, subdivision (a) authorizes the trial court to determine which of three measures of liability provided in the statute 'is appropriate under the circumstances,' and section 16440(b) gives the court discretion to excuse the trustee from liability for any breach of trust that he or she committed reasonably and in good faith, if it would be equitable to do so."[11] (*Arvizu,* at pp. 293–294, fn. omitted.)

The trial court concluded section 16440, subdivision (b)—discretion to excuse a breach of trust if committed in good faith—applied in these circumstances. The court did not abuse its discretion in this regard. When Steven made the distribution of the Walnut Creek property, he was relying on the appraisal made by Mike McGoldrick in May 2016. At that time, there was no other appraisal of the property, nor was there any claim a fractional discount rate should apply. Indeed, the trial court found "none of the beneficiaries objected to this method of valuation before [the siblings commenced] litigation; and there is no evidence that Steven's lawyer advised him that his method of valuation was incorrect." Accordingly, the court concluded "even if the Trust had not required a gross negligence finding prior to Trustee liability, the Court would excuse this mistake as unintentional and reasonable."

---

[11] Section 16440 provides: "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. (2) Any profit made by the trustee through the breach of trust, with interest. (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust. (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so." (§ 16440, subds. (a)(1)-(3), (b).)

The court also rejected Deborah and Loriann's request that it "order that all of the Exemption Trust property assets be returned to the Exemption Trust and a new reallocation process commence to address an [unintentional] inequities in the current disposition." The court observed it had found no breach of fiduciary obligations, no intentional misconduct, and no gross negligence. It also found that prior to making the distribution, Steven had "asked [Deborah and Loriann] for an alternate proposal. They failed to provide one. Since then, [they] received the Walnut Creek property (at their insistence) and the property has now been ordered sold in a partition action between [them] and the co-owners of that property, presumably because [they] and their new co-owners were unable to work cooperatively together. [Deborah and Loriann] have failed to establish their claims and therefore are not entitled to the remedies that they now seek."

In sum, the trial court did not err in finding no breach of fiduciary duty under the terms of the trust instrument in the valuation of the Walnut Creek property, and did not, in any case, abuse its discretion in denying Deborah and Loriann the equitable relief they sought. (See *Arvizu, supra,* 28 Cal.App.5th at p. 292.)

## DISPOSITION

The judgment is AFFIRMED. Costs on appeal to respondents.

_____
Banke, J.

We concur:

_____
Humes, P.J.

_____
Margulies, J.

A160247, Sonntag et al v. DeMartini et al

23